STATE OF NORTH CAROLINA v. CHRIS LEE RICHARDSON

No. 14A83

(Filed 31 May 1983)

1. **Robbery § 4.7— armed robbery—insufficiency of evidence**

    The State's evidence was insufficient to support conviction of defendant for armed robbery where it tended to show that defendant threatened the victim and struck him with a stick; the victim threw his duffel bag at defendant in self-defense; upon returning to the scene to retrieve his duffel bag, the victim was again threatened by defendant and left without picking up his bag; when the victim came back two days later, some personal items from his duffel bag were missing, including $17.00 from his wallet; and defendant was the person who took the $17.00 from the victim's wallet, since there was no evidence that defendant's threats or use of violence preceded or were concomitant with the taking of the victim's property and that defendant's threats induced the victim to part with his property.

**2. Criminal Law § 15.1 — motion for change of venue — pretrial publicity — inability to receive fair trial in county**

In a prosecution for second degree murder, armed robbery and assault with a deadly weapon inflicting serious injury in which various accounts of the incident in question suggested that it resulted from the perpetrator's disapproval of a group of people he thought were homosexuals who were swimming and sunning along a river, the trial court did not err in the denial of defendant's motion for a change of venue because of pretrial publicity where the vast majority of newspaper articles and radio and television news accounts of the incident were factual and noninflammatory. Nor did two newspaper editorials about the incident, the media's reports on meetings held by homosexuals and their supporters to protest the incident, or a public opinion survey showing that 87% of those surveyed were aware of the incident show that defendant could not receive a fair trial in the county so as to require a change of venue.

**3. Criminal Law § 22 — arraignment — name not on arraignment calendar — harmless error**

While the trial court erred in arraigning defendant without his consent when his name failed to appear on the arraignment calendar in violation of subsection (a) of G.S. 15A-943, such error was not prejudicial where defendant was nevertheless given a week's interval between his arraignment and trial pursuant to subsection (b) of that statute, and where defense counsel had previously advised the trial court that they would be ready for trial on the date of the arraignment.

**4. Criminal Law § 101 — failure to admonish jury fully before each recess**

The trial court did not err in failing to give the jury the full admonishments set forth in G.S. 15A-1236(a) prior to each recess where admonishments given to the jury prior to the recesses ranged from extensive instructions containing every caution set forth in G.S. 15A-1236(a) to a brief reminder to be aware of the instructions previously given by the court.

**5. Homicide § 16 — competency of statements as dying declarations**

Statements made by deceased were properly admitted as dying declarations pursuant to G.S. 8-51.1 where the trial court determined upon supporting evidence that deceased did in fact make statements to the effect that he knew he was dying. It was unnecessary for the court to find further that deceased believed there was no hope of recovery since deceased obviously had such a belief if he believed he was going to die.

DEFENDANT was tried during the 28 September 1981 Session of Superior Court, DURHAM County, before the *Honorable John C. Martin.* A jury found defendant guilty of murder in the second degree, robbery with a dangerous weapon, and assault with a deadly weapon inflicting serious injury. Defendant was sentenced to 25 years to life for the second-degree murder conviction, a concurrent term of seven years for the armed robbery conviction,

and a concurrent five-year term for the assault with a deadly weapon inflicting serious injury conviction. The Court of Appeals, in an opinion written by *Judge Hill* and with which *Judge Webb* separately concurred, found no prejudicial error in defendant's trial. Because *Judge Hedrick* dissented in part to the Court of Appeals' decision, defendant appeals to this Court as a matter of right under N.C.G.S. § 7A-30(2) (1981).

*Rufus L. Edmisten, Attorney General, by Henry T. Rosser, Assistant Attorney General, for the State.*

*Samuel Roberti, Attorney for defendant-appellant.*

FRYE, Justice.

The primary issue here — the same issue over which the three reviewing judges of the Court of Appeals could not agree — is whether the trial court erred in denying defendant's motion to dismiss the charge of robbery with a dangerous weapon at the close of the State's evidence. We agree with defendant, for the reasons discussed below, that the evidence was not sufficient as a matter of law to support defendant's conviction of robbery with a dangerous weapon. In addition, we address four other issues defendant raises: 1) whether the trial court erred in denying defendant's motion for a change of venue; 2) whether the trial court erred in arraigning defendant when defendant's name did not appear on the arraignment calendar; 3) whether the trial court erred in failing to extensively admonish the jurors at every recess not to discuss the case until they were to begin deliberating; and 4) whether the trial court erred in admitting a statement the victim made shortly before he died. We find no prejudicial error with respect to the trial court's rulings on each of these four issues.

I.

In the early afternoon of 12 April 1981 defendant, together with his wife Wendy Richardson, Guy Charles Osbahr, and Kathy Reddish (now Kathy Osbahr), went to the Little River in Durham County for an outing. After drinking some beer and playing in the water, defendant and Osbahr went into the woods. While they were there they saw Jerry Michael Penny. Penny testified that defendant threatened him and then hit him with a stick. Defend-

ant stated that he had not provoked the fight, that he had hit Penny only after Penny had struck him.

After the altercation with Penny, defendant and Osbahr saw Mark Demarias. Demarias testified that defendant threatened him as well and also struck him with a stick. At one point, Demarias stated that he threw his green duffel bag at defendant in self defense. Upon returning to retrieve it, defendant threatened him again, so Demarias left without picking up his bag. Demarias testified that when he came back two days later, some personal items from his duffel bag were missing, including $17 from his wallet and the duffel bag itself. The evidence tended to show that defendant had taken the $17 from Demarias' wallet.

After this second altercation, defendant, Osbahr and several others went over to the area where Ronald Antonevitch was seated. The State's evidence tended to show that defendant struck Antonevitch over the head and in the side with a stick while Antonevitch was sitting on a rock reading a book. Antonevitch later died from the blow to his head. Defendant testified that he struck Antonevitch in self defense because he thought Antonevitch was reaching for a gun.

The evidence also tended to show that defendant engaged in these altercations because he was upset that some of the male sunbathers at the Little River were nude and apparently thought some were homosexuals. The evidence showed, however, that all of the victims of these attacks were wearing clothing and that none were engaged in homosexual acts.

A jury found defendant guilty of the second-degree murder of Antonevitch; the armed robbery of Demarias; and assault with a deadly weapon inflicting serious injury on Penny. The Court of Appeals affirmed defendant's convictions. Defendant now appeals to this Court as a matter of right because Judge Hedrick dissented in part to the Court of Appeals' decision.

II.

[1] Defendant contends that the trial court erred in denying his motion to dismiss the charge of robbery with a dangerous weapon at the close of the State's evidence. We agree.

Upon defendant's motion to dismiss, the trial court is to determine whether there is substantial evidence: 1) of each essential element of the offense charged or of the lesser offense included therein, and 2) of defendant's being the perpetrator of the offense. If each of these requirements are satisfied, the motion is properly denied. *State v. Powell*, 299 N.C. 95, 98, 261 S.E. 2d 114, 117 (1980).

Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *State v. Smith*, 300 N.C. 71, 78-79, 265 S.E. 2d 164, 169 (1980). To withstand defendant's motion to dismiss the armed robbery charge, the State was required to show substantial evidence of each of the essential elements of armed robbery. Under N.C.G.S. § 14-87(a), robbery with a dangerous weapon is defined as "the taking of the personal property of another in his presence or from his person without his consent by endangering or threatening his life with a firearm or other deadly weapon with the taker knowing that he is not entitled to the property and the taker intending to permanently deprive the owner of the property." *State v. Powell*, 299 N.C. at 102, 261 S.E. 2d at 119. In the case at bar, the evidence at trial tended to show that after his altercation with Penny, defendant threatened Demarias and struck him with a stick. In self defense, Demarias threw his duffel bag at defendant. Upon returning to the scene to retrieve the bag, Demarias was threatened again by the defendant.

It is well settled law that the defendant must have intended to permanently deprive the owner of his property *at the time the taking occurred* to be guilty of the offense of robbery. *State v. McWilliams*, 277 N.C. 680, 687, 178 S.E. 2d 476, 480 (1971); *State v. Smith*, 268 N.C. 167, 169, 150 S.E. 2d 194, 198 (1966). When Demarias threw his duffel bag at defendant, the uncontroverted evidence indicates that he did so to protect himself. He stated he hoped this would slow down defendant and Osbahr so that he could escape without being harmed. At no point did defendant ask for or demand the property. On cross-examination Demarias testified as follows:

Q: In the process of hitting you, did he ask you for any money?

A: No.

Q: Did he ask you for that duffle bag?

A: Unh huh.

Q: How did that duffle bag get to him?

A: I threw it when I was protecting myself from that club.

Q: Then you weren't throwing it at him as a result of any request for money?

A:  No, just self-protection.

Q: Just self-protection and you didn't throw it at him because you thought maybe he wanted the duffle bag?

A: No, no.

Q: That thought never crossed your mind?

A: Unh huh.

Q: So, therefore, I take it that when you parted with that duffle bag, you did not consider yourself being robbed?

MR. EWARDS: Objection.

COURT: Overruled.

Q: Sir?

A: Repeat the question.

Q: When you parted with it, when you threw the duffle bag, you didn't consider yourself being robbed, you were throwing that duffle bag for self-protection, weren't you?

A: When I parted with that duffle bag, it was in protection, maybe to slow them down so I could get out of there without being harmed. They were both—they wanted to put our lights out. There was no doubt about it. I was scared for my life.

Q: You were concerned that they were going to assault you, isn't that correct? They did assault you, and you were concerned that they were going to assault you further?

A: Correct.

Q: You were not concerned about whether or not anybody was trying to rob you?

A: Not at that point, no.

Q: When you threw the duffle bag?

A: When I threw the duffle bag.

Q: Is it safe to say you threw that duffle bag freely and voluntarily?

A: No.

Q: Except to the extent that you were protecting yourself?

A: Protecting myself. (Nods affirmatively.)

Q: Did anybody ever ask you what was in that duffle bag, sir, prior to the time you threw it, of course?

A: No.

Thus, when Demarias parted with his property, defendant had not committed armed robbery — the necessary element of intent to deprive the owner permanently of his property was not present.

The State argues that defendant committed the offense of armed robbery when he retained possession of Demarias' property while threatening Demarias with the stick when he tried to retrieve his duffel bag. We disagree. Although many jurisdictions hold that evidence of a defendant's retention of property through the use of force or intimidation will support an armed robbery conviction, it appears that the majority of jurisdictions hold otherwise. 67 Am. Jur. 2d *Robbery* § 26, at 45-46 (1973).

Indeed, this Court decided over 125 years ago that the offense of robbery has not been committed unless the essential element of force or intimidation *precedes* or is *concomitant* with the taking. *State v. John,* 50 N.C. 163 (1857). Under an analogous circumstance — the use of force to escape with another's personal property after the property had been seized by stealth — the Court held that the offense of highway robbery was not committed. In *John,* the evidence tended to show that the defendant had his hand in the victim's pocket on his pocketbook, that the victim

immediately seized the defendant's arm, and that a scuffle ensued in which the victim was thrown out of a wagon while the defendant escaped with the victim's property. The court held that this was not sufficient evidence of highway robbery because there was "no violence — no circumstance of terror resorted to for the purpose of *inducing* the prosecutor to part with his property for the sake of his person." *Id.* at 167 (emphasis added). Instead, the court viewed the struggle between the defendant and the victim as "fairly imputable to an effort on the part of the prisoner to get loose from [the victim's] grasp and make his escape." *Id.* at 169. The holding in *John* indicates that in this State, the defendant's use of force or intimidation must necessarily precede or be concomitant with the taking before the defendant can properly be found guilty of armed robbery. That is, the use of force or violence must be such as to *induce* the victim to part with his or her property. This rule appears to be in accord with the majority of jurisdictions. 67 Am. Jur. 2d *Robbery* § 26, at 45-46. *See* Annot., 93 A.L.R. 3d 643, 643-53 (1979); *See also State v. Chapman*, 49 N.C. App. 103, 270 S.E. 2d 524 (1980), *citing State v. John*, 50 N.C. 163 (1857). Although the evidence tended to show defendant took Demarias' money, it is not sufficient as a matter of law to support the armed robbery conviction: there is no evidence that defendant's threats or use of violence preceded or were concomitant with the taking of the victim's property. As noted above, defendant's initial threats were not made to *induce* Demarias to part with his property. Thus, the trial court's denial of defendant's motion to dismiss the charge of armed robbery was in error. We hold, therefore, that defendant's conviction and sentence for robbery with a dangerous weapon must be vacated. *State v. Powell*, 299 N.C. at 102, 261 S.E. 2d at 119.

### III.

[2] Defendant contends that the trial court erred in denying his motion for a change of venue. Specifically, defendant argues that his constitutional right to due process was violated because of the existence of prejudicial pretrial publicity which prevented him from receiving a fair trial.

We note first that a motion for a change of venue as "addressed to the discretion of the trial judge and his ruling thereon will not be disturbed on appeal unless a manifest abuse of discre-

tion is shown." *State v. Faircloth,* 297 N.C. 100, 105, 253 S.E. 2d 890, 893, *cert. denied,* 444 U.S. 874, 100 S.Ct. 156, 62 L.Ed. 2d 102 (1979). The burden of showing "so great a prejudice against the defendant that he cannot obtain a fair and impartial trial" falls on the defendant. *State v. Boykin,* 291 N.C. 264, 269, 229 S.E. 2d 914, 917-18 (1976), *quoting* N.C.G.S. § 15A-957. Further, in *Sheppard v. Maxwell,* 384 U.S. 333, 86 S.Ct. 1507, 16 L.Ed. 2d 600 (1966), the United States Supreme Court held that "where there is a reasonable likelihood that prejudicial news prior to trial will prevent a fair trial, the judge should continue the case until the threat abates, or transfer it to another county not so permeated with publicity." *Id.* at 363, 86 S.Ct. at 1522, 16 L.Ed. 2d at 620. In determining whether the defendant in *Sheppard* received a fair trial, the United States Supreme Court examined a number of circumstances surrounding the defendant's trial. The Court looked not only at the nature and extent of the media coverage of the defendant's case but also at the court's control, or lack of it, over the trial itself.

With respect to the case at bar, we have examined the assorted newspaper clippings, televison news tapes, a public opinion poll and almost 250 pages of transcript dealing with the extensive *voir dire* conducted to select the members of the jury who eventually heard defendant's case. We are convinced after having viewed all of these materials that a change of venue was not required under the circumstances of this case.

The vast majority of these newspaper articles, and radio and television news broadcasts were factual, noninflammatory news accounts of the events that transpired. This Court has consistently held that where defendant shows only that the publicity surrounding his case consists of such factual, noninflammatory news stories, a trial court's denial of a change of venue is proper. *E.g.,* *State v. Oliver,* 302 N.C. 28, 36-37, 274 S.E. 2d 183, 189-90 (1981); *State v. Matthews,* 295 N.C. 265, 278-79, 245 S.E. 2d 727, 735-36 (1978), *cert. denied,* 439 U.S. 1128, 99 S.Ct. 1046-47, 59 L.Ed. 2d 90 (1979).

Defendant further argues, however, that two editorials which appeared in the Durham newspapers were extremely inflammatory. We note that the first editorial reflected on the brutality of the attack and stated that the perpetrators of the crime should

receive the harshest punishment the law allows. The second editorial mentioned the Little River incident in discussing generally the prevalence of senseless violence in society. Neither editorial mentioned defendant's name. We hold that these articles do not amount to inflammatory pretrial publicity sufficient to demand the granting of a motion for a change of venue.

Defendant also argues that he did not receive a fair trial because of the media's reports on three meetings held by homosexuals and their supporters to protest the Little River attacks. Various accounts of the incident suggested that the perpetrators of the attacks had committed the assaults because of their disapproval of a group of people they thought were homosexuals who were swimming and sunning along the Little River. About 125 to 200 people participated in the first rally at the Durham County Judicial Building. The meeting was held two days after defendant was arrested but more than five months before he was tried. A second meeting, a march through downtown Durham, was held on 27 June 1981 in which about 260 people participated. Although a newspaper account of the march stated that references were made during the march to the Little River incident, the theme of the march was a commemoration of the 12th anniversary of the gay rights movement. The marchers chanted, "Out of the closet and into the streets," while holding a banner which read, "Our Day Out, Durham, N.C.". Clearly, the Little River incident was not the focus of this march. A third rally, in which about 150 people participated, was held in Chapel Hill to protest the Little River attacks. Significantly, the protest was not held in Durham. We hold, therefore, that these meetings do not demonstrate that the Durham community as a whole held a pervasive prejudice against defendant.

Defendant next urges that a public opinion survey which he submitted in support of his motion for a change of venue demonstrated that the pretrial publicity surrounding defendant's case created such prejudice against defendant that he could not receive a fair trial. Dr. James Luginbuhl, an Associate Professor of Psychology at North Carolina State University, conducted a survey which indicated that of the 121 people included in the survey, 87 percent indicated that they remembered that a man had been attacked at the Little River and died. Various statistics were produced showing, among other things, the percentage of

people who correctly remembered the cause of death and whether someone had been arrested in the case. Defendant further supports his assertion that he has demonstrated extensive prejudicial pretrial publicity because 48 percent of the survey sample responded that they thought the perpetrator of the attack was "probably guilty," when asked: "From what you know right now do you think a person or persons who were arrested are probably guilty or probably not guilty?" We do not agree that defendant has demonstrated prejudicial pretrial publicity. We believe that the statistics that 87 percent of those surveyed were aware of the Little River incident shows only that many people were aware of the attack. The existence of publicity alone does not constitute sufficient grounds for a change of venue; the publicity must be *prejudicial. E.g., State v. Matthews,* 295 N.C. at 279, 245 S.E. 2d at 736. Further, as the District Attorney pointed out on the cross-examination of Dr. Luginbuhl, the survey did not attempt to determine the respondents' attitudes to the presumption of innocence until guilt is proven beyond a reasonable doubt or whether, as jurors, they could confine their determinations of guilt or innocence to the evidence presented in court. We think this is particularly significant given the fact that the survey participants were asked whether they thought the perpetrators of the attack were "probably guilty" on the basis of "*what you know right now.*"

Perhaps the most persuasive evidence that the pretrial publicity was not prejudicial or inflammatory are the potential jurors' responses to questions asked at the *voir dire* hearing conducted to select the jury. At the *voir dire* hearing, in which each potential juror was questioned about his or her knowledge of the case out of the presence of the others, almost all admitted to having read about the case in the newspaper or having heard about it on television. However, their recollections of those media accounts could only be described as vague. Indeed, when pressed for more details about the incident, several potential jurors apologized for not having remembered more about the Little River stories. More importantly, however, each juror selected to hear defendant's case unequivocally answered in the affirmative when asked if they could set aside what they had previously heard about defendant's case and determine defendant's guilt or innocence based solely on the evidence introduced at trial. In

sum, therefore, we hold that the trial court did not abuse its discretion in denying defendant's motion for a change of venue.

## IV.

[3]   Defendant also contends that the trial court erred in arraigning defendant when his name failed to appear on the arraignment calendar. We agree that this was error but hold that it was not prejudicial to defendant.

We note that defendant's trial was calendared for the week of 21 September 1981. Defendant appeared in court on 21 September with his counsel, stated that he had not yet been arraigned, and then objected to being arraigned on that day because his name had not appeared on the arraignment calendar. The trial court agreed that defendant's name was not on the arraignment calendar. However, in proceeding to arraign defendant on that day the trial court further found that defendant's case had been on previous Motion, Arraignment and Probation Calendars for hearings on various pretrial motions. The trial court further found that at the last pretrial hearing the District Attorney and defendant, through counsel, advised the trial court that they would all be ready for trial on 21 September 1981. In arraigning defendant on 21 September 1981, the trial court, nevertheless, continued defendant's case for one week.

N.C.G.S. § 15A-943 (1978), the statute governing arraignment procedures in Superior Court, provides as follows:

§ 15A-943. Arraignment in superior court — required calendaring. —

(a) In counties in which there are regularly scheduled 20 or more weeks of trial sessions of superior court at which criminal cases are heard, and in other counties the Chief Justice designates, the prosecutor must calendar arraignments in the superior court on at least the first day of every other week in which criminal cases are heard. No cases in which the presence of a jury is required may be calendared for the day or portion of a day during which arraignments are calendared.

(b) When a defendant pleads not guilty at an arraignment required by subsection (a), he may not be tried without his consent in the week in which he is arraigned.

(c) Notwithstanding the provisions of subsection (a) of this section, in any county where as many as three simultaneous sessions of superior court, whether criminal, civil, or mixed, are regularly scheduled, the prosecutor may calendar arraignments in any of the criminal or mixed sessions, at least every other week, upon any day or days of a session, and jury cases may be calendared for trial in any other court at which criminal cases may be heard, upon such days.

We note subsection (a) governs the procedures certain county prosecutors are required to follow in calendaring arraignments in Superior Court. In *State v. Shook*, 293 N.C. 315, 237 S.E. 2d 843 (1977), this Court held that subsection (a) places a statutory duty upon designated prosecutors to calendar *every* arraignment. *Id.* at 319, 237 S.E. 2d at 846 (emphasis in original). In *Shook*, the Court also interpreted subsection (b) as providing a defendant with the statutory right not to be tried without his consent in the week in which he was arraigned. *Id.* This Court further held that a violation of subsection (b), that is where defendant is tried without his consent in the week in which he was arraigned, is reversible error even though defendant does not show prejudice. *Id.*, 237 S.E. 2d at 847. The Court grounded its conclusion on the determination that subsection (b) vests defendant with a right to at least a week's interim between his arraignment and trial in order to prepare his case. The Court in *Shook* expressly left open the question with which we are presented here: Whether a violation of subsection (a) standing alone—that is, a failure to calendar a defendant's arraignment—constitutes reversible error when defendant nevertheless is given a week's interval between his arraignment and trial.

In *Shook*, we noted the official commentary to General Statutes, Chapter 15A, Article 51, Arraignment, which declares:

It is the purpose of this Article not only to define arraignment in any court but also to provide for a separate time of arraignment in superior court. Time for jurors and witnesses will be saved if matters not requiring their presence can be disposed of before they are brought in. The Commission feels that it is important to our system of justice that unnecessary impositions on the time of citizens be avoided. Thus, in the more populous counties here defined as those

having as much as 20 weeks of criminal court (and others which the Chief Justice may designate), a separate time for arraignment will be required. In other counties it is authorized on an optional basis.

*Id.* at 317-18, 237 S.E. 2d at 845. In so doing, the Court wrote that: "Obviously the financial interest of the state as well as the private interests of the individual jurors and witnesses are served by requiring arraignments to be calendared on days when jurors and witnesses are not called." *Id.* at 318, 237 S.E. 2d at 846. This Court then distinguished the societal interest in the efficient use of court time from the interest that is furthered under subsection (b), a defendant's right to a week's interval between his arraignment and trial. *Id.* Thus, it appears that the thrust of subsection (a), unlike subsection (b), is the promotion of the efficient use of time by the courts. Defendant has no direct interest in this underlying value. Rather, his only interest is in his vested right to a week's interval between his arraignment and trial which is provided under subsection (b).

We agree that it was error for the trial court to arraign defendant without his consent when the prosecutor failed to carry out his statutory duty to place defendant's name on the arraignment calendar. Indeed, to hold that it was not error would fail to recognize the prosecutor's statutory duty to calendar *all* arraignments. However, we do not find that in this case the error was prejudicial to defendant. Defendant was given notice that he would be tried on 21 September 1981. His counsel even stated that they would be prepared for trial at that time. Instead of going to trial, however, defendant was arraigned on 21 September and given an additional week to prepare his case.

## V.

[4] The thrust of defendant's next contention is that the trial court erred in failing to properly admonish the jury that, among other things, they were not to form any opinions about the case or discuss the case with anyone during court recesses, as required by N.C.G.S. § 15A-1236(a) (Cum. Supp. 1981). That statute provides:

(a) The judge at appropriate times must admonish the jurors that it is their duty:

State v. Richardson

(1) Not to talk among themselves about the case except in the jury room after their deliberations have begun;

(2) Not to talk to anyone else, or to allow anyone else to talk with them or in their presence about the case and that they must report to the judge immediately the attempt of anyone to communicate with them about the case;

(3) Not to form an opinion about the guilt or innocence of the defendant, or express any opinion about the case until they begin their deliberations;

(4) To avoid reading, watching, or listening to accounts of the trial; and

(5) Not to talk during trial to parties, witnesses, or counsel.

The judge may also admonish them with respect to other matters which he considers appropriate.

Defendant contends that the trial court erred in giving only partial instructions. Defendant is apparently contending that at each recess the trial court must recite each provision of N.C.G.S. § 15A-1236(a). We do not agree. The trial court admonished the jury about its duties many, many times throughout this trial which lasted several days. Those admonitions to the jurors ranged from an extensive enumeration of the juror's duties to a brief reminder to be aware of the instructions the court had given them previously. For example, at one point the trial court stated:

Members of the jury, it is time, now, for the evening recess. Please be back in your seats tomorrow morning at nine o'clock. We will resume the trial at that time. I caution you not to have any contact with the witnesses, attorneys or parties in this case, not to read anything in the newspaper, hear any radio or television production about the trial. Do not talk with your family at home about the case or with anyone else. Don't talk about it among yourselves. Don't form any impressions or opinions until you have heard all of the evidence, the arguments and instructions of the Court and have retired to deliberate.

This particular instruction is a model of clarity. Indeed, we fail to see why defendant contends that this particular instruction was erroneous because it contains every caution set out in N.C.G.S. § 15A-1236(a). At other points throughout the trial the instructions were less extensive. For example, the trial court instructed the jury before another recess as follows:

> Remember during the luncheon recess not to discuss the case with anyone or allow anyone to discuss it with you. Do not discuss it among yourselves. Don't form any opinions or conclusions about the case until you have heard all the evidence and arguments of counsel and the charge of the Court.

In perhaps one of his briefest instructions the trial court stated before one evening recess:

> Members of the jury, please observe carefully the cautions that I haven (sic) you at the other recesses. I know you don't want me to repeat them and every one (sic), but I am required by law to remind you of them at every recess, and I would appreciate your observing them.

We hold that these instructions, when examined in the context in which they were given—that is, instructions made repeatedly not to discuss the case or form an opinion about it which were delivered to a group of adult men and women—were perfectly adequate. We are confident that the members of the jury who sat on defendant's case were well aware of their statutory duties as jurors.

## VI.

[5] Defendant finally contends that the trial court erred in admitting into evidence statements that were made by the deceased, Ronald Antonevitch, a short time before Antonevitch lost consciousness and died. Specifically he contends the trial court erred in not explicitly finding as a fact that Antonevitch believed he had "no hope of recovery" when he made his dying declarations.

In *State v. Hamlette*, 302 N.C. 490, 276 S.E. 2d 338 (1981), this Court restated the requirements which must be met before a dying declaration will be admitted into evidence. The Court wrote:

Dying declarations by the person whose death is at issue have long been admissible in North Carolina provided: (1) at the time they were made the declarant was in actual danger of death; (2) he had full apprehension of the danger; (3) death did in fact ensue; and (4) declarant,[1] if living, would be a competent witness to testify to the matter.

*Id.* at 495-96, 276 S.E. 2d at 342.

The Court then noted that the "General Assembly codified the essentials of these requirements in G.S. 8-51.1." *Id.* That statute reads:

The dying declarations of a deceased person regarding the cause or circumstances of his death shall be admissible in evidence in all civil and criminal trials and other proceedings before courts, administrative agencies and other tribunals to the same extent and for the same purposes that they might have been admissible had the deceased survived and been sworn as a witness in the proceedings, subject to proof that:

(1) At the time of the making of such declaration the deceased was conscious of approaching death and believed there was no hope of recovery;

(2) Such declaration was voluntarily made.

"The admissibility of these declarations is a decision for the trial judge, and appellate review is limited to the narrow question of whether there is any evidence tending to show the prerequisites of admissibility." *State v. Hamlette*, 302 N.C. at 496-97, 276 S.E. 2d at 343, *citing State v. Stevens*, 295 N.C. 21, 28-29, 243 S.E. 2d 771, 776 (1978).

In the case at bar, two police officers testified on *voir dire* that they interviewed Antonevitch at the hospital to investigate the assault made on him earlier in the day at the Little River. They testified that throughout the interview, in which Antonevitch recounted the attack made on him, he repeatedly stated to them: "Oh God, I am dying; somebody please help me." They

---

1. Although the term "defendant" appeared here in *Hamlette*, the correct term, "declarant," is found in *State v. Stevens*, 295 N.C. 21, 28, 243 S.E. 2d 771, 776 (1978), one of the cases upon which the Court relied in *Hamlette* in restating the requirements a dying declaration must satisfy before it will be admitted into evidence.

testified that these statements were made about 5 p.m. and 7 p.m., a short time before Antonevitch lost consciousness about 8 or 8:30 p.m. and died from the blow to his head. Although one of the doctors at the hospital testified that Antonevitch never made any such statements while he was present and that in his opinion Antonevitch was not aware of his approaching death, the trial court found as a fact that Antonevitch did make these statements to the officers which indicated he was aware he was dying. This finding was amply supported by the two officers' testimony. Defendant contends, however, that the trial court erred in not finding explicitly that Antonevitch believed he had "no hope of recovery" when he made these statements. In *State v. Hamlette*, 302 N.C. at 496, 276 S.E. 2d at 343, this Court stated that, "it is not necessary that declarant personally express his belief that he has no chance of recovery. This may be shown by the circumstances." When the trial court found that Antonevitch did in fact make statements to the effect that he knew he was dying, the finding was the same as an explicit statement that the court had found Antonevitch believed he had "no hope of recovery" when he made the statements at issue. As Chief Justice Sharp stated for the Court in *State v. Stevens*, 295 N.C. at 29, 243 S.E. 2d at 776: "Obviously, if one believes he is going to die he believes there is 'no hope of recovery.'" We hold, therefore, that the trial court properly admitted Antonevitch's dying declarations.

### VII.

For the reasons discussed above, we must reverse the decision of the Court of Appeals affirming defendant's conviction and sentence on the charge of robbery with a dangerous weapon and remand the case to the Court of Appeals with directions to remand to the Superior Court, Durham County, for proceedings consistent with this opinion.

Case No. 81CRS10449 reversed and remanded.

We affirm the Court of Appeals' decision to the extent it held that defendant's convictions for murder in the second degree and assault with a deadly weapon inflicting serious injury were free from prejudicial error.

Case No. 81CRS9076 and No. 81CRS10740 affirmed.