STATE OF NORTH CAROLINA v. LEE WAYNE HUNT

No. 41A87

(Filed 26 July 1989)

1. **Criminal Law § 86.9— character evidence concerning accomplice—defendant not prejudiced**

    A defendant tried for two first degree murders was not prejudiced by evidence that defendant's accomplice had been arrested for the attempted murder of his girlfriend where defendant had offered evidence through several witnesses that the accomplice, alone, committed both murders for which defendant was on trial, and evidence tending to show that the accomplice was a bad character with a propensity for murder buttressed defendant's evidence and theory of the case.

    **Am Jur 2d, Criminal Law § 166; Evidence §§ 321, 340.**

2. **Criminal Law § 48— admission by adoption—conduct of defendant—exception to hearsay rule**

    In this prosecution for two first degree murders, statements made by an accomplice in defendant's presence that the "fat bitch begged us not to kill her too" and that he "was surprised how easy it was and how easy it had gone over that they got the pot back" were admissible against defendant as implied admissions under Rule 801(d)(B) where the witness also testified that, after each of these statements, defendant looked up and gave the accomplice a long glance "like he had better hush" or "had better shut up," since defendant's affirmative conduct indicating that the accomplice "had better hush" or "had better shut up" could reasonably be found by a jury to manifest defendant's adoption or belief in the truth of the accomplice's statements. N.C.G.S. § 8C-1, Rule 801(d)(B).

    **Am Jur 2d, Criminal Law § 166; Evidence §§ 610, 623.**

3. **Criminal Law § 79.1— question concerning accomplice's conviction—objection sustained—defendant not prejudiced**

    The rule that a conviction of one defendant is not competent evidence of the guilt of another on the same charges was not violated by the prosecutor's question to an accomplice's sister as to whether she had seen her brother convicted on two charges of first degree murder of the victims where the trial court sustained defendant's objection to the question.

STATE v. HUNT

[325 N.C. 187 (1989)]

Moreover, evidence that the accomplice had been convicted of murdering the victims could not have prejudiced defendant since he sought to establish at trial that the accomplice, alone, committed the murders.

**Am Jur 2d, Criminal Law § 166; Evidence §§ 321, 340.**

4. **Criminal Law § 169.3 — objection to testimony — similar evidence admitted without objection**

The benefit of defendant's objection to testimony referring to defendant's home as "Fort Apache" was lost where similar evidence was admitted without objection.

**Am Jur 2d, Evidence § 249.**

5. **Criminal Law § 86.1 — credibility of defendant — cross-examination about matters while incarcerated**

The prosecutor's cross-examination of defendant concerning certain men he had entrusted to read his mail and write letters for him while he was incarcerated awaiting trial was proper to question the credibility of defendant's testimony that he had trusted two persons other than a State's witness to perform these tasks. Even if the prosecutor improperly suggested in his questions to defendant that one of these men was "facing three life sentences" and that defendant was comfortable with him because "he was the same type of person you were," defendant was not prejudiced thereby where the jury was aware of the prison setting in which defendant found himself and of the types of criminals who might be incarcerated there.

**Am Jur 2d, Evidence § 340; Witnesses §§ 495, 534.**

6. **Jury § 7.13 — peremptory challenges — no authority to increase statutory number**

The trial court had no authority to increase the number of peremptory challenges provided by N.C.G.S. § 15A-1217.

**Am Jur 2d, Jury § 242.**

7. **Criminal Law § 15.1 — pretrial publicity — denial of venue change**

The trial court did not abuse its discretion in the denial of defendant's motion for a change of venue of murder and conspiracy to murder charges because of pretrial publicity where a reporter's affidavit and an attorney's testimony of-

fered by defendant did not show that defendant could not receive a fair trial in the county; newspaper articles relating to the murders of the victims and the charges against defendant were factual and noninflammatory; and jurors who served in the case all indicated unequivocally that they would decide the case based on the evidence at trial and had not formed an impression or preconceived opinion about the guilt or innocence of defendant.

**Am Jur 2d, Criminal Law § 378.**

8. **Criminal Law § 43.1— photographs of defendant and accomplice—ability of witness to identify defendant and accomplice—illustration of testimony**

Color photographs made of defendant and his alleged accomplice soon after their arrest for the murders of the victims were properly admitted for the purpose of demonstrating the ability of the witness to identify defendant and his accomplice and to illustrate his testimony even though defendant admitted that the witness knew defendant and the accomplice and could identify them.

**Am Jur 2d, Evidence § 791.**

9. **Criminal Law § 89.1— State's witness—improper character evidence—harmless error**

Assuming arguendo that the chief jailer's testimony that certain security measures were taken after a State's witness reported that defendant's alleged accomplice stood outside the jail and pointed a shotgun at the window of the witness's cell constituted improper evidence of the witness's character for truthfulness in violation of N.C.G.S. § 8C-1, Rule 608, the admission of the jailer's testimony was harmless error where there was no evidence that defendant participated in any way or had any knowledge of the incident, and the probative value of the testimony was so slight that it could not have affected the outcome of the trial.

**Am Jur 2d, Witnesses § 563.**

APPEAL by the defendant, pursuant to N.C.G.S. § 7A-27(a), from judgments sentencing him to two consecutive terms of life imprisonment entered by *Brannon, J.*, on 17 October 1986 in Superior Court, CUMBERLAND County. On 27 September 1988 the Supreme

STATE v. HUNT

[325 N.C. 187 (1989)]

Court allowed the defendant's motion to bypass the Court of Appeals as to additional judgments imposing sentences of less than life imprisonment. Heard in the Supreme Court on 10 April 1989.

*Lacy H. Thornburg, Attorney General, by James J. Coman, Senior Deputy Attorney General, William N. Farrell, Jr., Special Deputy Attorney General, and Ellen B. Scouten, Assistant Attorney General, for the State.*

*Gordon Widenhouse for the defendant-appellant.*

MITCHELL, Justice.

The defendant Lee Wayne Hunt was tried upon proper bills of indictment charging him with two counts of first degree murder and two counts of conspiracy to commit murder. A jury found the defendant guilty of all crimes as charged. After a sentencing hearing pursuant to N.C.G.S. § 15A-2000, the same jury recommended a sentence of life imprisonment for each murder conviction. The trial court entered judgments sentencing the defendant to two consecutive life sentences for the first degree murder convictions. The trial court also entered judgments sentencing the defendant to two consecutive ten-year terms for the conspiracy to commit murder convictions.

The evidence at trial tended to show that on 7 March 1984, Roland "Tadpole" Matthews and his wife Lisa K. Matthews were found dead in the living room of their Fayetteville home. Roland Matthews was found seated in a chair; Lisa was on her knees, slumped over a coffee table. Their two-year-old child was found unharmed in a bedroom. Autopsies of the bodies revealed that both victims died as a result of being shot and stabbed. Three men—Jerry Dale Cashwell, Kenneth Wayne West, and the defendant—were indicted for the murders.

Gene Williford, Jr. testified for the State under a grant of immunity. He testified that, approximately two weeks prior to the murders, ten to fourteen pounds of marijuana had been "ripped off" from the defendant. On 6 March 1984, the day before the murders, Williford went to the defendant's house around 8:00 a.m. after being told that the defendant wanted to see him. When Williford arrived at the defendant's house, Jerry Cashwell, Kenneth West, and a man named Terry Lofton were there with the defendant. The defendant told the men that he had found out that Roland

Matthews — also known by the nickname "Tadpole" — had stolen the marijuana and that he was going to "teach Tadpole a lesson" that nobody could steal "pot" from him. The defendant gave Cashwell fifty dollars and a bag of marijuana. He then instructed Cashwell to go to Roland Matthews' place of work and wait for him. After buying something for Tadpole with the money, Cashwell was to accompany him home. Williford was to take the defendant and West to the Matthews' home later that night, where the defendant was going to confront Tadpole about the theft. Nothing was said in Williford's presence about how the defendant intended to "teach Tadpole a lesson."

During the early morning hours of 7 March 1984, Williford picked up the defendant and West at the defendant's house. The three men went to River Road where Williford let the defendant and West out near a dirt road not far from the Matthews' residence. The defendant instructed Williford to pick them up in thirty minutes. Williford left and returned in thirty minutes but did not see anyone. He left a second time and returned later to see West, Cashwell and the defendant running up to the car. West was carrying a green trash bag. Williford noticed that West and the defendant "looked like they had blood on them." The defendant told Williford to "shut up and get out of there quick." Williford then drove to the defendant's house.

At the defendant's house, all four men got out of the car, but Williford stayed outside while the others went inside to change clothes and clean up. About fifteen minutes later, West, Cashwell, and the defendant came back out of the house. They had changed clothes and had two green trash bags with them. Williford testified that the defendant told him that they were going to "stash the pot and get rid of the clothes" and for Williford to go home, be careful and get with the defendant later.

Several days later Williford returned to the defendant's residence. While the defendant and Williford were standing outside the house, the defendant told Williford that he and West were going to Florida for a couple of weeks until "all this blew over." The defendant also warned Williford not to say anything about being on River Road "that night" and, if he were questioned, to state that he had not seen the defendant "that night."

Jeffrey Dale Goodman testified that while he and the defendant were in safekeeping at Central Prison, the defendant told him

that he was charged with two counts of first degree murder but that "all they had was just two dead bodies, no witnesses" and that "they would never find the gun." The defendant described the murders to Goodman, stating that the man was shot first, the woman jumped up, and she was shot in the head, their throats were cut and a baby who was too small to tell anything was put in the back room. The defendant told Goodman that the couple was "killed over drug money."

Additional evidence for the State included expert testimony tending to show that the two bullets recovered from Lisa Matthews' body and two other bullets recovered from the Matthews' home were all fired from the same gun. The bullets were either .38 or .357 caliber and were probably made by Remington-Peters.

An officer from the Fayetteville Police Department testified that on 16 March 1984, he received six .38 caliber Remington-Peters bullets from Allen Jernigan. Subsequently, Jernigan turned over a partial box of Remington-Peters .38 caliber ammunition to the authorities. Jernigan testified that Jerry Cashwell gave him the box of ammunition after the victims were murdered. Expert testimony tended to show that the four fired bullets recovered from the crime scene and the unfired bullets from the box were so similar that it was likely that they all came from the same box.

The defendant offered evidence that Jerry Cashwell, alone, was responsible for the murders. Several people testified that Cashwell told them how he had killed the victims. The defendant also testified that Cashwell told him that he (Cashwell) had murdered the victims.

In rebuttal, the State offered the testimony of Samuel Thompson. He said that Cashwell told him while they were both inmates in the Cumberland County Jail that West, Cashwell, and the defendant had killed Lisa and Roland Matthews. Thompson also testified that Cashwell informed him that he (Cashwell) was in jail for attempted murder of his girlfriend.

[1] By his first assignment of error the defendant contends that the trial court committed reversible error by admitting evidence that Jerry Cashwell had been arrested for attempted murder of his girlfriend. He argues that this evidence was inadmissible because it amounted to improper impeachment of Cashwell's statements which had been introduced by the defendant and because it was

inadmissible evidence of Cashwell's character. The defendant points out that this Court ruled that this same evidence was irrelevant and unduly prejudicial to Cashwell in his own trial. *State v. Cashwell,* 322 N.C. 574, 369 S.E. 2d 566 (1988).

When, as here, alleged errors relate to rights arising other than under the Constitution of the United States, a defendant is prejudiced only when there is a reasonable possibility that, had the error in question not been committed, a different result would have been reached. N.C.G.S. § 15A-1443(a) (1988). The defendant has the burden of showing such prejudice. *Id.*

In the present case, even if it is assumed *arguendo* that it was error to admit the evidence the defendant complains of, it was not prejudicial. The defendant offered evidence through several witnesses that Cashwell, alone, committed both murders. The evidence that Cashwell had attempted to kill his girlfriend, if anything, buttressed the defendant's evidence and theory of ·the case. The defendant could only benefit from evidence that tended to show that Cashwell was a bad character with a propensity for murder. The defendant having failed to show prejudice, we overrule the defendant's first assignment of error.

[2]   The defendant next assigns as error the trial court's admission into evidence of testimony concerning certain statements made by West several days after the victims were killed. Williford testified that he returned to the defendant's residence several days after the victims were killed. After talking to the defendant outside the house, Williford accompanied him inside. Cashwell, West and Terry Lofton were present. Williford testified that during this time someone—West thought it was Lofton—asked "what happened," and West made the statements "that fat bitch begged us not to kill her too" and that he "was surprised how easy it was and how easy it had gone over that they got the pot back." Williford also testified that after each of these statements, the conversation ceased and the defendant looked up and gave West "a long glance like he had better shut up."

The defendant argues that Williford's testimony concerning West's statements and the defendant's reaction was inadmissible hearsay because the defendant's "silence" did not meet the requirements for implied admissions under Rule 801(d)(B) of the North Carolina Rules of Evidence. N.C.G.S. § 8C-1, Rule 801(d)(B) (1986). We conclude, however, that the defendant's affirmative conduct indi-

cating that West "had better hush" or "had better shut up" could reasonably be found by a jury to manifest the defendant's adoption or belief in the truth of West's statements, thereby making them admissible under Rule 801(d)(B).

"An admission or other declaration, though not made during or in furtherance of the conspiracy, is admissible against a defendant if made in his presence and *adopted by him by conduct* or silence . . . ." 2 Brandis on North Carolina Evidence § 173 (3d ed. 1988) (emphasis added). In the present case, there was evidence from which the jury could reasonably find that West had firsthand knowledge concerning the events he referred to in his statements. Furthermore, there is evidence from Williford's testimony that the defendant was present and heard West make the statements. Williford testified, over the defendant's objections, that after West made each of the statements, conversation ceased and the defendant "just looked at . . . [West], you know, like he had better hush" or "had better shut up." Such testimony by Williford was "a shorthand statement of facts," and, therefore, was admissible when, as here, the facts on which the witness bases his testimony are difficult to describe in a way which will permit jurors to draw their own inferences. *State v. Williams*, 319 N.C. 73, 352 S.E. 2d 428 (1987); 1 Brandis on North Carolina Evidence § 125 (3d ed. 1988). *See* N.C.G.S. § 8C-1, Rules 602 and 701 (1986). Based on Williford's testimony in this regard, the jury would have been justified in believing that the defendant's *conduct* in reaction to West's statements indicated that the defendant understood that the "us" West referred to included the defendant and that West "had better hush" or "had better shut up," but not that West's statements were untrue. Therefore, the jury could have reasonably found that the defendant's affirmative actions amounted to *conduct* manifesting his adoption of West's statements or his belief in their truthfulness. *See generally* Annotation, *Nonverbal Reaction to Accusation, Other Than Silence Alone, as Constituting Adoptive Admission Under Hearsay Rule*, 87 A.L.R. 3d 706 (1978 & Supp. 1988). "[A] response which is not the equivalent of a denial may indicate acquiescence and be considered by the jury for what it is worth." 2 Brandis on North Carolina Evidence § 179 at 55 (3d ed. 1988). This assignment of error is without merit.

**[3]** By his next assignment of error, the defendant maintains that he is entitled to a new trial because the trial court erred in permitting the prosecutor to cross-examine Joann Cashwell—the sister of

Jerry Cashwell—about her brother's previous trial and convictions for the murders of the victims. The defendant called Joann Cashwell to testify. She was cross-examined, over the defendant's objections, regarding whether she had testified at her brother's trial. Then, in his recross-examination of Joann, the prosecutor asked her if she had attended her brother's trial and seen him convicted of two counts of first degree murder. Although the trial court sustained his objection and allowed the motion to strike, the defendant argues that the prosecutor's questions contained improper information about Cashwell's convictions which resulted in unfair prejudice to the defendant.

The general rule is that a conviction of one defendant is not competent as evidence of the guilt of another on the same charges. *State v. Campbell*, 296 N.C. 394, 250 S.E. 2d 228 (1979). Even if it is assumed *arguendo* that the State sought to introduce such evidence for that purpose, however, the rule was not violated in the present case. The trial court sustained the defendant's objection to the question concerning the disposition of the charges against Jerry Cashwell. Generally, the asking of a question alone will not result in prejudice. *Id.* at 399, 250 S.E. 2d at 230; *State v. Barrow*, 276 N.C. 381, 172 S.E. 2d 512 (1970). Furthermore, it is difficult to see how evidence that Cashwell previously had been tried and convicted of these murders could have prejudiced the defendant in the present case, since the defendant sought to establish by his own evidence at trial that Cashwell, alone, had committed them. This assignment of error is without merit.

[4] By his next assignment of error, the defendant contends that the State's introduction of evidence referring to his home as "Fort Apache" was inadmissible character evidence prohibited by Rule 404(a) of the North Carolina Rules of Evidence. N.C.G.S. § 8C-1, Rule 404(a) (1986). The defendant points to the use of the term in the testimony of Gene Williford. Williford had testified that he had met West at the defendant's house where they both had spent a lot of their free time. The prosecutor asked where the defendant's house was located. The following exchange then occurred:

GENE WILLIFORD: It's over in East Fayetteville, across from the Pay-Lo service station, off of Highway 53.

MR. COMAN: Does that area have any common name that it is known by in the community?

MR. COOPER: Objection.

COURT: Overruled.

WILLIFORD: It's been referred to as Fort Apache before.

. . . .

COURT: This is received solely for the purpose of identification of a given place and for no other purpose.

The defendant asserts that the fact that a person "lives in a home commonly referred to as a fort suggests a violent disposition . . . ." However, the defendant has neither cited authority nor given any additional reasoning to support this contention.

The defendant's counsel made references to "Fort Apache" to prospective jurors during jury selection. Further, at one point in the trial, the defendant specifically withdrew his objection to the State's use of a report referring to his home as "Fort Apache." This Court frequently has held that when, as here, evidence is admitted over objection, but the same or similar evidence has been previously admitted or is later admitted without objection, the benefit of the objection is lost. *State v. Maccia*, 311 N.C. 222, 316 S.E. 2d 241 (1984); 1 Brandis on North Carolina Evidence § 30 (3d ed. 1988). This assignment is without merit.

[5] In support of his next assignment, the defendant argues that the trial court erred in allowing the prosecutor, over objection, to cross-examine him concerning certain men he had entrusted to read his mail and write for him while he was incarcerated awaiting trial. He contends that the prosecutor impermissibly suggested in his questions during cross-examination of the defendant that one of these men, Alton Green, was "facing three life sentences" and that the defendant was "comfortable with Green because he was the same type of person you were . . . ." Furthermore, he maintains that although the trial court attempted to limit the jury's consideration of this testimony solely to the question of why the defendant relied on certain persons to read his mail for him, the prejudice was overwhelming.

During his testimony, the defendant denied making the inculpatory statement in prison attributed to him by the State's witness Jeffrey Goodman and denied that Goodman had read his mail or written letters for him. On re-direct examination by his counsel, the defendant again denied that Goodman wrote letters

for him and testified that Green or a man named "Spider" wrote his letters for him. In this context, the prosecutor's questions would appear to involve proper cross-examination seeking to question the credibility of the defendant's testimony that he had trusted Green and Spider as opposed to the State's witness Goodman by inquiring as to why the defendant would trust those men rather than Goodman.

Even assuming *arguendo* that it was error for the trial court to permit the prosecutor to ask such questions, the defendant has not carried his burden of showing that there is a reasonable possibility a different result would have been reached at trial had the error not been committed. N.C.G.S. § 15A-1443(a) (1988). There was unobjected-to testimony that the defendant, as well as Spider, Green, and Goodman, were together in Central Prison. Therefore, the jury was aware of the prison setting in which the defendant found himself and of the types of criminals who might be incarcerated there. This assignment is without merit.

By another assignment, the defendant contends that the following question by the prosecutor to an investigating officer resulted in reversible error:

Q: Now, during the course of your investigation into this matter, have you had occasion to become familiar with the reputation of this Defendant for the use of violence?

A: Yes, sir. I have.

The defendant's objection was sustained by the trial court. Nevertheless, the defendant contends that he was prejudiced by the mere asking of the question. As we previously noted, a defendant is not ordinarily prejudiced when his objection to an improper question is sustained. *State v. Whisenant*, 308 N.C. 791, 303 S.E. 2d 784 (1983) (no prejudice found when objection sustained to a question asking if the witness knew that the defendant was a convicted felon). We detect no prejudice to the defendant in the present case. This assignment is without merit.

The defendant next assigns as error the trial court's refusal to allow his motions for a change of venue or, in the alternative, for additional peremptory challenges. He argues that he demonstrated to the trial court that inflammatory and emotionally charged pretrial publicity concerning his case made it reasonably likely that he could not receive a fair trial in Cumberland County.

[6]   Initially, we note that the trial court did not err in refusing to permit the defendant to exercise more peremptory challenges than provided for by N.C.G.S. § 15A-1217. The trial court had no authority to increase the number of peremptory challenges provided by that statute. *State v. Johnson*, 298 N.C. 355, 259 S.E. 2d 752 (1979).

[7]   We turn, then, to consider the defendant's motion for a change of venue. On a motion for change of venue pursuant to N.C.G.S. § 15A-957, the defendant has the burden of demonstrating that, due to pretrial publicity, there is a reasonable likelihood that he will not receive a fair trial. *State v. Jerrett*, 309 N.C. 239, 307 S.E. 2d 339 (1983). In most cases, the defendant must specifically identify prejudice among the jurors who were selected and actually served in his case in order to carry this burden. *State v. Hunt*, 323 N.C. 407, 415, 373 S.E. 2d 400, 407 (1988). In determining if there is identifiable prejudice, it is important to examine the statements of the jurors regarding whether they can decide the case based on the evidence and not on pretrial publicity. *Id.* Additionally, a motion for a change of venue is addressed to the sound discretion of the trial court, and its ruling will not be disturbed on appeal absent an abuse of discretion. *State v. Richardson*, 308 N.C. 470, 302 S.E. 2d 799 (1983).

After examining the newspaper articles, affidavit, and the transcript of the testimony which the defendant offered in support of his venue motion as well as the statements by the jurors during the jury *voir dire* in this case, we conclude that the trial court did not abuse its discretion.

The affidavit offered by the defendant was from a local reporter who merely indicated that he believed people living within two miles of the defendant's residence would be influenced by the defendant's reputation. We find no indication in the reporter's affidavit that the defendant could not otherwise receive a fair trial in Cumberland County.

The defendant also offered the testimony of an attorney in support of his motion for change of venue. This testimony established that certain newspaper articles were published concerning the defendant. Further, the attorney had talked with three or four people in his church about the defendant's case, but he could not say that a jury selected in Cumberland County at the time of defendant's trial would have any particular knowledge of the matter.

The newspaper articles in evidence relating to the murders of the victims and the charges against the defendant were factual and noninflammatory. Even if some of the articles can be deemed to have contained inflammatory statements, the defendant has made no showing that it was reasonably likely that the jurors in his case would base their decisions upon pretrial information rather than the evidence presented at trial or would be unable to remove from their minds any preconceived impressions they may have formed.

In *State v. Richardson*, 308 N.C. 470, 302 S.E. 2d 799, this Court stated that "the most persuasive evidence that the pretrial publicity was not prejudicial or inflammatory" was the potential jurors' responses to questions asked during the *voir dire* hearing conducted to select the jury. 308 N.C. at 480, 302 S.E. 2d at 805. We noted in *Richardson* that when prospective jurors were questioned about their knowledge of the case out of the presence of the others, "almost all admitted to having read about the case in the newspaper or having heard about it on television. However, their recollections of those media accounts could only be described as vague." *Id.* Moreover, we stated in *Richardson* that the most important evidence that the pretrial publicity about the case was not prejudicial was that each juror selected to hear the case "unequivocally answered in the affirmative when asked if they could set aside what they had previously heard about defendant's case and determine defendant's guilt or innocence based solely on the evidence introduced at trial." *Id.*

In the present case, the trial court permitted individual *voir dire* questioning of each prospective juror concerning his or her knowledge of the case, out of the presence of the other jurors. Five jurors who served in this case indicated that they had no prior knowledge of the case before they were selected to serve on the jury. The other seven jurors indicated they had a vague memory of reading or hearing news accounts of the murders at the time that they had occurred more than two years previously. The jurors who served in this case all indicated unequivocally that they would decide the case based on the evidence at trial and had not formed an impression or preconceived opinion about the guilt or innocence of the defendant. As in *Richardson*, the defendant has not made a showing of identifiable prejudice in his case. Therefore, this assignment of error is without merit.

[8]   The defendant contends by his next assignment of error that the trial court erred in allowing the State to introduce certain photographs into evidence. Specifically, he challenges the introduction of two 8 by 10 inch color photographs — one of his alleged accomplice, Jerry Cashwell, and one of the defendant himself — which were made soon after their arrests for the murders of the victims. The defendant maintains that the photographs were irrelevant because neither his identity nor Cashwell's identity was at issue in this case. Moreover, he argues that they were prejudicial to him because both men appeared unkempt and unshaven. He argues that both photographs unfairly suggest that the subjects have criminal histories.

Having examined the photographs, which were used to illustrate Williford's testimony, we find no merit to the defendant's argument. First, the defendant has made no showing that the photographs in question made the men look any different than they actually appeared in March 1984 at the time of the murders; however, there is some indication from the record that the men's appearances had changed from the time of the murders to the time of the trial. Even a stipulation by the defendant cannot limit the State's *right* to prove all essential elements of its theory of the case. *State v. Elkerson*, 304 N.C. 658, 285 S.E. 2d 784 (1982); *State v. Lester*, 294 N.C. 220, 240 S.E. 2d 391 (1978); 2 Brandis on North Carolina Evidence § 166 (3d ed. 1988). The defendant's admission that Williford knew Cashwell and the defendant and that Williford could identify them did not preclude the State from introducing photographs to illustrate Williford's testimony concerning his ability to identify the defendant and Cashwell at the time of the murders and at the time of trial. The State had a right to show that Williford was not confused about the identity of the men.

The defendant cites the recent holding in *State v. Hennis*, 323 N.C. 279, 372 S.E. 2d 523 (1988), where this Court concluded that the trial court's admission of photographic evidence was error and awarded a new trial. That case is easily distinguishable from the present case. *Hennis* turns on the repetitious introduction of an excessive number of large, gruesome photographs of the victims' bodies, from which this Court concluded that the probative value of the photographs was outweighed by their unduly prejudicial effect. *Id.* In the present case, only one picture of each of two alleged participants in the murders was admitted into evidence

for the purpose of demonstrating the ability of the witness to identify them and to illustrate his testimony.

In his brief the defendant raises more specific complaints referring to Cashwell's photograph than to his own. He contends that Cashwell appears with "the bright red eyes of an animal occasioned by the inartful use of a flashbulb" and "looks wild and mean." The defendant could not have been harmed by the jury's exposure to an unflattering photograph of Cashwell which "suggested a criminal history" and in which he appeared "wild and mean." The defendant himself sought to show at trial that Cashwell, alone, had committed the murders. We conclude that the admission of these photographs was not error.

[9] Finally, the defendant assigns as error the admission into evidence of the testimony of the chief jailer for Cumberland County that security improvements were instituted at the jail after the State's witness Gene Williford reported an incident. First, Williford had testified, over the defendant's objection, that he told officials at the Cumberland County jail that West had threatened him. Williford testified that West stood outside the jail below Williford's cell window, made threatening gestures, and pointed a gun at the window. The trial court admitted this testimony to show Williford's state of mind. Later in its case-in-chief, the State called the chief jailer to testify that certain security measures were installed after Williford reported the incident.

The defendant vigorously cross-examined Williford at trial and sought to establish his lack of credibility by, among many other tactics, showing that in his first statement to police, Williford did not implicate West in the murders. Therefore, we detect no error in allowing the State to rebut any lack of credibility implicit in Williford's failure to mention West in the first statement by having Williford testify that West had threatened Williford and his family if Williford talked to police. Williford testified that this occurred on one occasion at Williford's residence and on another occasion in front of the jail, when West pointed a shotgun at Williford who was inside.

The defendant argues, however, that allowing the chief jailer to testify that certain security measures were taken after Williford reported the alleged incident at the jail improperly permitted the State to introduce evidence of Williford's character for truthfulness in violation of N.C.G.S. § 8C-1, Rule 608. Assuming *arguendo* that

the trial court erred by allowing the State to introduce the testimony of the chief jailer, we conclude that the error was harmless. The testimony of the chief jailer related only to the actions of jail officials in taking certain security measures after receiving a report of an alleged incident between Williford and West but did not indicate that the defendant Hunt participated in any way or had any knowledge of the incident. Although the testimony of the chief jailer had very little, if any, relevance to any fact or matter at issue in the defendant's trial, we conclude that its probative value was so slight that it could not have affected the outcome. The defendant having failed to carry his burden of showing prejudice in this regard, we find no merit in this assignment of error.

For the foregoing reasons, we conclude that the defendant received a fair trial free of prejudicial error.

No error.