NO. COA13-1208

NORTH CAROLINA COURT OF APPEALS

Filed: 2 September 2014

STATE OF NORTH CAROLINA
  Plaintiff

v.           Cleveland County
             Nos. 09 CRS 57186
                09 CRS 57187
                10 CRS 285

DONALD EUGENE BORDERS
  Defendant


Appeal by defendant from judgments entered 29 January 2013 by Judge Richard D. Boner in Cleveland County Superior Court. Heard in the Court of Appeals 22 May 2014.

> *Attorney General Roy Cooper, by Assistant Attorney General Mary Carla Hollis, for the State.*

> *Rudolf Widenhouse & Fialko, by M. Gordon Widenhouse Jr., for defendant-appellant.*


HUNTER, JR., Robert N., Judge.


Donald Eugene Borders ("Defendant") appeals from a jury verdict finding him guilty of raping and murdering Margaret Tessneer ("Ms. Tessneer"). Defendant argues (i) that the trial court erred by admitting DNA evidence obtained by officers after effectuating an arrest based on an unrelated warrant at his domicile; (ii) that the trial court erred by denying his motion

for a change of venue because pretrial publicity made it impossible to empanel an impartial jury; and (iii) that the trial court abused its discretion in allowing the admission of expert testimony that Ms. Tessneer died from asphyxiation because the testimony was unreliable and lacked a proper foundation. After careful review, we find no error in the trial court's judgments.

## I. Facts & Procedural History

Defendant was indicted on 11 January 2010 for rape and felonious breaking and entering in File Nos. 09 CRS 057186 and 09 CRS 05187. Defendant was also indicted on 8 March 2010 for first-degree murder in File No. 10 CRS 00285. Defendant stood trial in Cleveland County Superior Court, beginning on 13 November 2012 and ending on 29 January 2013. The record and trial transcript below tended to show the following facts.

Immediately prior to Defendant's trial, the trial court held a suppression hearing concerning a DNA sample acquired from a cigarette used by Defendant, the facts surrounding which are discussed in Section III *infra*. After the hearing on Defendant's motion to suppress the DNA evidence, Defendant twice moved for a change of venue; neither request was granted. The jury was empaneled and the State called Amy Fredell ("Ms.

Fredell"), a Service Division Supervisor with the Shelby Police Department, as its first witness.

## A. Events of 20 September 2003

Ms. Fredell testified that on 20 September 2003, the Shelby Police Department received a 911 call requesting that an officer be dispatched to 1024 Railroad Avenue, where a death had occurred. Patrol Officer Victor Haynes ("Officer Haynes") was dispatched to the residence, where Officer Haynes saw Ms. Tessneer, an elderly woman, lying on a bed in the home. Ms. Tessneer's feet were on the floor, she was clothed in a light-colored nightgown, her eyes were fixed, and her mouth was open. Officer Haynes observed false teeth next to her body on the bed. Officer Haynes did not find a pulse or observe her breathing. Officer Haynes stated that Ms. Tessneer felt cold. Officer Haynes cleared the residence and then went outside to ensure that emergency medical service personnel ("EMS") came to the residence.

Louie Ledford ("Mr. Ledford") of EMS arrived at the scene. Mr. Ledford entered with Officer Haynes, checked Ms. Tessneer's vital signs, and found that Ms. Tessneer had passed away. Officer Haynes surveyed the home and found two cement blocks stacked outside of Ms. Tessneer's bedroom window as well as some

phone lines that had been cut on the same side of the house. Mr. Ledford testified Ms. Tessneer was not breathing when he arrived at her home. After taking Ms. Tessneer's pulse, Mr. Ledford told Officer Haynes that she was dead, closed her eyes with his gloved fingers, and covered her body with a sheet. Mr. Ledford described the body as "morbid," having bruising on the wrists and arms, and stated that a pool of blood collected around Ms. Tessneer's body. Mr. Ledford did not notice any signs of struggle.

Ms. Tessneer's daughter, Libby Clark ("Ms. Clark"), testified that on 20 September 2003, Ms. Clark took her husband to the doctor's office, stopped by Hardee's to purchase a biscuit, and purchased another biscuit to take to her mother. Ms. Clark arrived at her mother's home at around 11 A.M. Ms. Clark stated that upon leaving her car, she noticed a cement block underneath her mother's bedroom window, which she thought was unusual. Ms. Clark then walked up the home's steps and through the unlocked screen door, which her mother usually kept locked. Ms. Clark then saw her mother laying on her bed. Ms. Clark ran to Ms. Tessneer's phone to dial 911, but found that the phone did not work. Ms. Clark tried another phone, which also did not work. Ms. Clark then ran to a neighbor's home,

asking the woman inside to dial 911 and then went to her uncle's home, which was near Ms. Tessneer's residence.

Another of Ms. Tessneer's daughters, Peggy Sparks ("Ms. Sparks"), testified. Ms. Sparks spent her lunch break on 19 September 2003 with her mother. Ms. Sparks stated that her mother was "in good spirts," that Ms. Tessneer was laughing and that Ms. Sparks enjoyed the visit. Ms. Sparks stated that her mother was not dating anyone at the time and showed no signs of injuries on 19 September 2003. Ms. Sparks described her mother's habit of locking both her screen door and main door at her home. Ms. Sparks stated that both doors were locked when she visited her mother on 19 September 2003 and that the screen door did not appear damaged.

Crime Scene Investigator Todd Vickery ("Investigator Vickery") performed the crime scene walkthrough on 20 September 2003. Investigator Vickery observed that Ms. Tessneer's false teeth were lying next to her on the bed, that some pantyhose were also on the bed, and that some blood was on the bed's mattress pad. Investigator Vickery also noticed a small tear on the entry door to the screened-in front porch, near the door's latch. Investigator Vickery then dusted for fingerprints, took photographs, and began collecting physical items. Investigator

Vickery stated that "[o]ther than the area around Ms. Tessneer, the house appeared to be neat and in order."

Gaston Memorial Hospital pathologist Dr. Steven Tracy ("Dr. Tracy") testified at trial as an expert in forensic pathology, over Defendant's objection. Dr. Tracy performed an autopsy of Ms. Tessneer on 22 September 2003. Dr. Tracy stated that Ms. Tessneer had bruising to her arms, legs, one of her feet, left shoulder, and abdomen. Dr. Tracy believed Ms. Tessneer's injuries occurred within twenty-four hours of her death. Ms. Tessneer also had hemorrhaging over the surface of her arms. Dr. Tracy noted that many elderly people have surface hemorrhages. Dr. Tracy stated that without knowing Ms. Tessneer, he did not know whether the hemorrhages were there before or after the bruising occurred. Ms. Tessneer's right forearm also contained an abrasion near her hemorrhages.

Dr. Tracy described a tear to the outer portion of Ms. Tessneer's panties and a small amount of blood on the panties. Dr. Tracy also stated that Ms. Tessneer had a small abrasion to her vagina.

Dr. Tracy also used an SBI sexual assault evidence collection kit ("sexual assault kit") and took swabs from Ms. Tessneer's vagina, cheek, and rectum. In February 2004, the

North Carolina State Bureau of Investigation Crime Laboratory ("SBI") reported that its testing showed the presence of sperm on the vaginal swab taken from Ms. Tessneer's sexual assault kit. A DNA profile of the evidence was created from the vaginal swab, but no DNA match was made at that time.

Immediately after the autopsy, Dr. Tracy withheld his opinion as to the cause of death. Dr. Tracy stated that the bruises on the body did not in and of themselves account for Ms. Tessneer's death, and no other anatomical findings apparent at that point explained her cause of death. Dr. Tracy's autopsy report lists the cause of death as undetermined, but contained a discussion stating that Dr. Tracy was "considering suffocation." Dr. Tracy stated that he waited for microscopic slides and a toxicology report to come back, and after ruling out "any other reasonable cause of death to a reasonable degree of medical certainty," Dr. Tracy opined that Ms. Tessneer died of asphyxiation secondary to suffocation. Dr. Tracy stated that this may have occurred after Ms. Tessneer's mouth was covered with a soft object, "such as a pillow or cushion, a piece of clothing or a hand." Dr. Tracy also testified that markings or injuries typically do not appear if the suffocation was

effectuated by a soft object, and that injuries from suffocation are often very difficult to detect.

Dr. Tracy testified that police contacted him in 2009 and asked if he would consider changing his 2003 opinion about the cause of death. Dr. Tracy stated that the police did not suggest suffocation. Dr. Tracy also has not modified his written autopsy report to reflect suffocation. Dr. Tracy stated that he was willing to add an addendum to his report indicating that Ms. Tessneer died of asphyxiation, secondary to suffocation, but had not amended the autopsy report to reflect that view. Dr. Tracy stated that he always believed "to a reasonable degree of medical certainty that Ms. Tessneer died of asphyxiation." Dr. Tracy became even more confident in this opinion after receiving information about the examination of the sexual assault kit and lack of other findings as to Ms. Tessneer's cause of death.

Dr. John D. Butts ("Dr. Butts"), a retired chief medical examiner for the State of North Carolina, testified at trial. Defendant did not object to Dr. Butts being tendered as an expert in the field of forensic pathology. Dr. Butts stated that he had consulted with Dr. Tracy in December 2003 and that the two had agreed the best designation for the cause and manner

of Ms. Tessneer's death was "undetermined" because "the evidence was overwhelmingly [sic] that Ms. Tessneer's death was not the result of natural causes" but that there was not sufficient evidence to state the cause of death.

Dr. Butts later learned about the sexual assault kit's contents in 2009 after being contacted by the local district attorney.  Dr. Butts prepared another report after learning of the evidence derived from the sexual assault kit's contents in which he opined that Ms. Tessneer had died from "external forces or causes rather than some natural process" at the hands of another individual.  Dr. Butts stated in this report that "the environment and circumstances under which [Ms. Tessneer] was found were highly suspicious.  There was evidence of entry into the house.  Her telephone line had been cut or disabled."  Dr. Butts also testified that her body was found in an unusual position for a natural death, that there was injury to her body, disturbances to her clothing, bruises on her body, and bruises in the entrance to Ms. Tessneer's vagina.  Dr. Butts testified the toxicological tests revealed the presence of the pain medication Ms. Tessneer used, but that the amount was not excessive.  Dr. Butts also noted the lack of a catastrophic natural event, findings consistent with an advanced disease

process, or stroke, or any "evidence of a significant underlying medical condition either in her history or in the autopsy report upon examination that would explain her death." Dr. Butts testified that given the circumstances, the "most common mechanism of death would be an asphyxiation." Dr. Butts also testified that the autopsy report was not amended and that no one had coerced him into changing his opinion concerning the cause of death.

**B. 2009 Investigation of Ms. Tessneer's Death**

Agent John Kaiser ("Agent Kaiser") testified that he was contacted by Detective Rich Ivey ("Detective Ivey") in April 2009 to assist in the investigation of Ms. Tessneer's death. Detective Ivey was working in the Shelby Police Department at that time. Agent Kaiser and Detective Ivey worked through the case file and devised an investigative strategy. The two noticed that there was a suspect book in the case file as well as a DNA profile from the sexual assault kit; they resolved to work through the suspect book to clear individuals in the book or to find a match. There were around thirty individuals listed in the book, including Defendant.

On 4 May 2009, Detective Ivey and Agent Kaiser found Defendant at his mother's residence in Cherryville, where he

lived. Defendant refused to comply with or submit to police officers' request for a DNA sample. Officers visited Defendant on a total of four separate occasions at his home and requested a DNA sample; officers visited on 4 May 2009, 6 May 2009, 8 May 2009, and once more after 8 May 2009 and prior to Defendant's arrest on 16 May 2009.

Agent Kaiser contacted Officer James Brienza ("Officer Brienza") on 13 May 2009 and asked Officer Brienza to serve an active warrant for assault on a female on Defendant. Agent Kaiser asked Officer Brienza to obtain DNA evidence from Defendant, "either from a drink can or some abandoned material."[1] Officer Brienza verified that the assault on a female warrant was still active and then served the warrant on Defendant on 16 May 2009 at his mother's residence in Cherryville.

Officer Brienza arrived at the Cherryville residence between 12:00 A.M. and 2:00 A.M. on 16 May 2009. Officer Brienza knocked at the door and spoke with Defendant's mother. Defendant's mother allowed Officer Brienza into her home, where Officer Brienza found Defendant asleep. Officer Brienza woke Defendant up and told Defendant to come with him so he could

---

[1] Agent Kaiser stated that he purposefully left his instruction to Officer Brienza vague so that Officer Brienza would obtain a DNA sample off of a drink can, a cigarette, or another object.

serve the arrest warrant. Defendant got dressed and was taken outside in handcuffs. Defendant was handcuffed in the front of his body.[2]

Officer Brienza noticed a pack of cigarettes on the nightstand near where he found Defendant and "felt like there was a good opportunity to take advantage of possible D.N.A. gathering at that point from a cigarette butt." Officer Brienza "asked [Defendant] if he wanted to smoke a cigarette before we left," to which Defendant replied affirmatively.

Officer Brienza testified that Defendant smoked a cigarette "[o]utside in the front porch area towards the driveway, next to the car. We had walked from the front porch area and down to my vehicle" where Defendant smoked the cigarette. Officer Brienza testified that Defendant did not smoke the entire cigarette, but that Defendant was allowed "enough time to take several hits off of the cigarette – several drags." After Defendant took these cigarette drags, Officer Brienza "asked him if he would like me [to] discard the cigarette and told him that we needed to

---

[2] In his affidavit attached to the motion to suppress, Defendant asserts that he was handcuffed with his hands behind his back. Defendant also stated that one of the police officers pulled a cigarette from his cigarette pack and placed it in his mouth so he could smoke. During Officer Brienza's testimony at trial, Officer Brienza stated that he handcuffed Defendant in front of his body and no other evidence was provided tending to show that Defendant was handcuffed behind his back.

leave." Officer Brienza stated that Defendant responded affirmatively to his offer to discard the cigarette.

Officer Brienza, who was wearing gloves, "took the cigarette from his mouth and acted like [he] was going to get rid of the cigarette." Officer Brienza then "extinguished the end of the cigarette on the ground and cupped it, put it in a plastic bag[,] and took [Defendant] to jail." Defendant objected to the admission of this evidence under the Fourth Amendment of the United States Constitution, under "Article 19 – Article 1, Section 19, 20 and 23 of the North Carolina Constitution and also under State versus Reed." Defendant's objection was overruled by the trial court.

Officer Brienza stated that no part of the cigarette which touched Defendant's mouth had made contact with the ground. Officer Brienza also testified that after processing Defendant at the jail, he called Agent Kaiser to tell him about the evidence he had gathered and released the cigarette into his custody thereafter. Officer Brienza was the only officer to serve the warrant and approach Defendant initially, although other officers arrived later in a "support role."

Officer Brienza testified that he had two goals that evening: (i) to serve a warrant and (ii) to obtain a DNA sample.

Officer Brienza stated that obtaining the DNA sample was the primary goal of his visit. Officer Brienza recounted that Defendant carried the cigarette outside and that Defendant was in his custody when Defendant smoked the cigarette, as well as when Defendant was asked whether he wanted Officer Brienza to discard the cigarette.

After Officer Brienza delivered the cigarette butt to Agent Kaiser, Agent Kaiser sent the cigarette butt to the SBI, which performed DNA tests on the cigarette butt. After Agent Kaiser learned that the DNA test results matched the DNA profile derived from a swab in Ms. Tessneer's sexual assault kit, Agent Kaiser obtained a second arrest warrant charging Defendant for murder, rape, and breaking and entering. Agent Kaiser and Officer Brienza served Defendant with the warrants at his mother's home on 28 December 2009. Agent Kaiser and Officer Brienza showed Defendant a picture of Ms. Tessneer and asked whether he recognized her; Defendant said he did not recognize her and denied ever having been in contact with her. Agent Kaiser and Detective Ivey also obtained a search warrant authorizing them to collect a suspect evidence collection kit from Defendant, whereby Defendant was required to provide the officers with a cheek swab. The DNA profile extracted from the

cheek swab matched the DNA profile collected from the sperm found in Ms. Tessneer's sexual assault kit.

After the State rested its case at trial, Defendant moved to dismiss the case, and his motion was denied by the trial court. Defendant did not testify at trial, nor did Defendant present evidence. The trial court denied Defendant's renewed motion to dismiss. On 28 January 2013, the jury returned verdicts finding Defendant guilty of first-degree murder on a felony murder theory; first-degree rape; and felonious breaking and entering. The trial court arrested judgment with respect to the first-degree rape conviction. The trial court then sentenced Defendant to life in prison without the possibility of parole based upon the first-degree murder conviction. The trial court also sentenced Defendant to a concurrent term of ten to twelve months imprisonment based upon the felonious breaking and entering conviction. Defendant provided timely notice of appeal on 29 January 2013.

## II. Jurisdiction & Standard of Review

Defendant appeals as of right from a decision of the trial court. N.C. Gen. Stat. §§ 7A-27(b), 15A-1444(a) (2013).

The first issue concerns whether the trial court erred in denying a motion to suppress the DNA evidence. This Court

reviews conclusions of law stemming from the denial of a motion to suppress *de novo*. *State v. Barnhill*, 166 N.C. App. 228, 230, 601 S.E.2d 215, 217, *disc. rev. denied*, 359 N.C. 191, 607 S.E.2d 646 (2004).

"Under *de novo* review, we examine the case with new eyes." *State v. Young*, ___ N.C. App. ___, ___, 756 S.E.2d 768, 779, *cert. granted* ___ N.C. ___ (2014). "[D]e *novo* means fresh or anew; for a second time, and an appeal *de novo* is an appeal in which the appellate court uses the trial court's record but reviews the evidence and law without deference to the trial court's rulings." *Parker v. Glosson*, 182 N.C. App. 229, 231, 641 S.E.2d 735, 737 (2007) (quotation marks and citations omitted). "Under a *de novo* review, the court considers the matter anew and freely substitutes its own judgment for that of the lower tribunal." *Craig v. New Hanover Cnty. Bd. of Educ.*, 363 N.C. 334, 337, 678 S.E.2d 351, 354 (2009) (quotation marks and citation omitted).

The second issue on appeal concerns the trial court's denial of Defendant's motions for a change of venue. The third issue concerns Defendant's objections to expert testimony regarding the cause of death. Both the second and third issue are reviewed under an abuse of discretion standard. *State v.*

*Ward*, 364 N.C. 133, 139, 694 S.E.2d 738, 742 (2010) (reviewing the admissibility of expert testimony under an abuse of discretion standard); *State v. Whitaker*, 43 N.C. App. 600, 603, 259 S.E.2d 316, 318 (1979) (reviewing the denial of a change of venue motion under an abuse of discretion standard).

"Abuse of discretion results where the court's ruling is manifestly unsupported by reason or is so arbitrary that it could not have been the result of a reasoned decision." *State v. Hennis*, 323 N.C. 279, 285, 372 S.E.2d 523, 527 (1988).

### III. Analysis

### A. Motion to Suppress DNA Evidence

Defendant makes three principal arguments concerning the first issue. First, Defendant argues that he did not willfully relinquish control of his cigarette butt to Officer Brienza. Second, Defendant argues that because the cigarette butt was given to Officer Brienza within the curtilage of his home, Defendant had a reasonable expectation of privacy in the cigarette butt and the DNA derived from it. Third, Defendant argues that the ruse crafted by Officer Brienza and Agent Kaiser to obtain his DNA violated the Fourth Amendment.

In this section, we first set forth the facts established at the hearing concerning Defendant's motion to suppress. We

then discuss the fundamental principles that guide our inquiry, including our binding precedents relating to searches within the curtilage, trickery, and abandoned property. We then apply our precedents to address Defendant's arguments.

### i. Pre-Trial Hearing and Order on Motion to Suppress

The trial court held a pretrial hearing concerning Defendant's motion to suppress the DNA evidence obtained as a result of Officer Brienza's seizure of a cigarette butt containing Defendant's DNA. At the hearing, Agent Kaiser noted that Defendant had denied officers' earlier requests to provide a DNA sample on four separate occasions prior to Officer Brienza's arrest of Defendant on 16 May 2009.

Agent Kaiser and Detective Ivey initially approached Defendant at his mother's residence on 4 May 2009 and told Defendant that they were investigating the death of three elderly women in 2003. Defendant refused to consent to the giving of a DNA sample. Defendant refused to provide a DNA sample three additional times and told police that he had retained an attorney after the fourth request. Agent Kaiser did not believe the police had sufficient evidence to request the issuance of a search warrant or an arrest warrant in connection with Ms. Tessneer's death at that time.

After Defendant refused to voluntarily provide a DNA sample, Agent Kaiser spoke with Vivian Borders, Defendant's ex-wife. Vivian Borders told police that she had sought two warrants for Defendant's arrest, one for damage to personal property and another for assault on a female. Agent Kaiser located the warrant for assault on a female, which was active and held in the Gaston County Warrant Repository. Agent Kaiser then contacted Officer Brienza and requested that he serve the assault on a female warrant on Defendant.[3] Agent Kaiser also requested that Officer Brienza collect DNA from Defendant, and made suggestions about collecting a soda can or a cigarette. Agent Kaiser also wanted Officer Brienza to take the DNA sample without Defendant's knowledge. Agent Kaiser said he wasn't sure what he told Officer Brienza, but that he "had in [his] mind [that] it could be at the jail. It could be in the car in transit. It could be, you know, any different scenarios that could have played out."

Agent Kaiser described Defendant's arrest at 2 A.M. on 16 May 2009 and Defendant's smoking of a cigarette before leaving his mother's home that evening. Agent Kaiser said that Officer Brienza offered Defendant a cigarette, which Defendant smoked

---

[3] The assault on a female charge was eventually dismissed.

prior to entering Officer Brienza's patrol car. Officer Brienza "asked [Defendant] if he — meaning [Defendant] — wanted Brienza to discard the cigarette. [Defendant] told Brienza he did and allowed Brienza to take the cigarette butt from his mouth."

Agent Kaiser stated that if Officer Brienza was not initially successful in obtaining a DNA sample upon arrest, the purpose of serving the warrant in the late evening was to keep Defendant in custody and develop another plan to capture his DNA.

Officer Brienza recounted the same facts as Agent Kaiser, saying that he offered Defendant a cigarette and "asked if he would let me dispose of the cigarette." On cross, Officer Brienza was asked if he had said "you want me to take that and throw it away," and Officer Brienza responded affirmatively. Officer Brienza said he took the cigarette from Defendant's mouth, extinguished it, cupped it in his hand, and placed the cigarette into an evidence bag. Officer Brienza confirmed that he was wearing latex gloves. Officer Brienza also said he would not have allowed Defendant to bring the cigarette into the police car.

The trial court entered an order denying Defendant's motion to suppress the DNA evidence collected from the cigarette butt.

In its order, the trial court made these relevant findings of fact:

8. When Officer Brienza said it was time to leave the premises, the officer asked the defendant if he wanted the officer to dispose of the cigarette. The defendant replied affirmatively. Officer Brienza removed the cigarette from the defendant's lips. Unbeknownst to the defendant, the officer kept the cigarette butt in his cupped hand. The officer later placed the cigarette butt in a plastic evidence bag.

9. The defendant did not give consent to the officer's removal of the cigarette butt from the premises of the residence, and he was unaware that the cigarette butt had been taken by the officer.

. . .

20. Officer Brienza obtained the cigarette butt while the he [sic] and the defendant were standing in the driveway of the residence of the defendant's mother. The driveway was bounded on both sides by the front yard of the residence.

The trial court then concluded as a matter of law that

1. The area where Officer Brienza obtained the cigarette butt was located within the curtilage of the residence, and it was an area in which the defendant had a reasonable expectation of privacy.

2. The defendant consented to the removal of the cigarette from his lips, and he authorized Officer Brienza to dispose of the butt. By doing so the defendant relinquished possession of the butt and any reasonable expectation of privacy with

regard to it. That he did so in a protected area as a result of trickery is of no consequence.

## ii. Guiding Principles in Search and Seizure Jurisprudence

The guiding principles in this case are derived from the Fourth Amendment to the United States Constitution and Section 20 of the North Carolina Constitution:

> The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.

U.S. Const. amend. IV; N.C. Const. art. I, § 20 ("General warrants, whereby any officer or other person may be commanded to search suspected places without evidence of the act committed, or to seize any person or persons not named, whose offense is not particularly described and supported by evidence, are dangerous to liberty and shall not be granted."); *see also* N.C. Const. art. I, § 19 ("No person shall be taken, imprisoned, or disseized of his freehold, liberties, or privileges, or outlawed, or exiled, or in any manner deprived of his life, liberty, or property, but by the law of the land. No person shall be denied the equal protection of the laws; nor shall any

person be subjected to discrimination by the State because of race, color, religion, or national origin.").

"[T]he touchstone of [Fourth] Amendment analysis has been . . . whether 'a person has a constitutionally protected reasonable expectation of privacy.'" *Oliver v. United States*, 466 U.S. 170, 177 (1984) (quoting *Katz v. United States*, 389 U.S. 347, 360 (1967) (Harlan, J., concurring). Further:

> The Amendment does not protect the merely subjective expectation of privacy, but only those expectations that society is prepared to recognize as reasonable. No single factor determines whether an individual legitimately may claim under the Fourth Amendment that a place should be free of government intrusion not authorized by warrant. In assessing the degree to which a search infringes upon individual privacy, the Court has given great weight to such factors as the intention of the Framers of the Fourth Amendment, the uses to which the individual has put a location, and our societal understanding that certain areas deserve the most scrupulous protection from government invasion.

*State v. Phillips*, 132 N.C. App. 765, 770, 513 S.E.2d 568, 572 (1999) (citation, quotation marks, and alterations omitted).

An individual's expectation of privacy is "necessarily . . . of a diminished scope" when taken into police custody. *Maryland v. King*, ___ U.S. ___, ___, 133 S. Ct. 1958, 1978 (2013) (citation, quotation marks, and alterations

omitted).  DNA evidence may also be obtained without consent of a suspect after "officers make an arrest supported by probable cause to hold for a serious offense . . . ."  *Id.* at \_\_\_, 133 S. Ct. at 1980.  Our General Statutes allow for compulsory DNA sample collection from a suspect arrested for any one of several offenses.  N.C. Gen. Stat. § 15A-266.3A(f) (2013).  Defendant was initially arrested pursuant to N.C. Gen. Stat. § 14-33(c)(2) (2013), which is not one of the enumerated offenses for which police officers may compel the collection of DNA evidence.  *See* N.C. Gen. Stat. § 15A-266.3A(f).

"Searches conducted without warrants have been held unlawful 'notwithstanding facts unquestionably showing probable cause,' for the Constitution requires that the deliberate, impartial judgment of a judicial officer . . . be interposed between the citizen and the police . . . ."  *Katz*, 389 U.S. at 357 (citations and quotation marks omitted).  "[S]earches conducted outside the judicial process, without prior approval by judge or magistrate, are *per se* unreasonable under the Fourth Amendment—subject only to a few specifically established and well-delineated exceptions."  *Id.*

One such exception allows police to conduct warrantless searches of garbage left for regular curbside collection.

*California v. Greenwood*, 486 U.S. 35, 38 (1988). Our Supreme Court has recognized that "a reasonable expectation of privacy is not retained in garbage simply by virtue of its location within the curtilage of a defendant's home." *State v. Hauser*, 342 N.C. 382, 386, 464 S.E.2d 443, 446 (1995). However, *Hauser* also held that "the defendant may have retained *some expectation of privacy in garbage placed in his backyard out of the public's view*, so as to bar search and seizure by the police themselves entering his property." *Id.* at 388, 464 S.E.2d at 447 (emphasis added). This Court identified three factors relevant to the *Hauser* inquiry in *State v. Reed*, 182 N.C. App. 109, 112, 641 S.E.2d 320, 322, *writ denied*, *review denied*, *appeal dismissed*, 361 N.C. 701, 653 S.E.2d 155 (2007): "(1) the location of the garbage; (2) the extent to which the garbage was exposed to the public or out of the public's view; and (3) 'whether the garbage was placed for pickup by a collection service and actually picked up by the collection service before being turned over to police.'" *See id.* (quoting *Hauser*, 342 N.C. at 386, 464 S.E.2d at 446). This exception becomes relevant in conjunction with the principles governing the seizure of abandoned property discussed *infra*.

The State may also not violate a constitutional right indirectly if the State was not permitted to take that same action directly. *State v. Griffin*, 154 N.C. 611, 615, 70 S.E. 292, 293 (1911) ("'What the state may not do directly it may not do indirectly.'" (quoting *Bailey v. State of Alabama*, 219 U.S. 219, 244 (1911))); *see also Henderson v. Mayor of City of New York*, 92 U.S. 259, 263 (1875) ("That which cannot be done directly will not be permitted to be done indirectly."); *State v. Behrman*, 114 N.C. 797, 807, 19 S.E. 220, 223 (1894) ("A declaration excluded by the Constitution, as in violation of individual right, will not be allowed to accomplish indirectly what it is not permitted to do directly.").

"Evidence obtained in violation of the Fourth Amendment's guarantee against unreasonable searches and seizures is generally excluded at trial." *State v. Banner*, 207 N.C. App. 729, 732, 701 S.E.2d 355, 358 (2010). The exclusionary rule that has developed under Fourth Amendment jurisprudence is also applicable to "evidence obtained in violation of the North Carolina Constitution." *Id.; see also State v. Carter*, 322 N.C. 709, 724, 370 S.E.2d 553, 562 (1988). "[O]ur constitution demands the exclusion of illegally seized evidence. The courts cannot condone or participate in the protection of those who

violate the constitutional rights of others." *Carter*, 322 N.C. at 723, 370 S.E.2d at 561.

### iii. Curtilage

"The Fourth Amendment 'indicates with some precision the places and things encompassed by its protections': persons, houses, papers, and effects." *Florida v. Jardines*, ___ U.S. ___, ___, 133 S. Ct. 1409, 1414 (2013). However, "when it comes to the Fourth Amendment, the home is first among equals." *Id.* At the core of the Fourth Amendment is the "'right of a man to retreat into his own home and there be free from unreasonable governmental intrusion.'" *Id.* (quoting *Silverman v. United States*, 365 U.S. 505, 511 (1961)). The area "immediately surrounding and associated with the home" is known as the curtilage, and is considered "part of the home itself" for Fourth Amendment purposes. *Id.* (citation and quotation marks omitted). "This area around the home is 'intimately linked to the home, both physically and psychologically,' and is where 'privacy expectations are most heightened.'" *Id.* at 1415 (quoting *California v. Ciraolo*, 476 U.S. 207, 213 (1986)).

Curtilage includes the "yard around the dwelling house as well as the area occupied by barns, cribs, and other outbuildings." *State v. Rhodes*, 151 N.C. App. 208, 214, 565

S.E.2d 266, 270, *writ denied, review denied*, 356 N.C. 173, 569 S.E.2d 273 (2002). Evidence obtained from a trash can located within the curtilage may also be subject to the exclusionary rule if not placed there for routine collection. *Rhodes*, 151 N.C. App. at 215, 565 S.E.2d at 271 ("[B]ecause the trash can was within the curtilage of [the] defendant's home and because the contents of the trash can were not placed there for collection in the usual and routine manner, [the] defendant maintained an objectively reasonable expectation of privacy in the contents of his trash can.").

## iv. Trickery

"The known official may engage in deception leading the consenting party to conclude that the official's objective is other than criminal prosecution or that the official's objective relates to a form of criminal activity different from that which actually prompted the official to seek consent." Wayne R. LaFave, 4 Search & Seizure § 8.2(n) 176 (5th ed. 2012). However, "there is no common understanding as to what constitutes permissible deception in enforcing the criminal law." *Id.* at 181.

Employing fraud or trickery in collecting evidence does not, by itself, render evidence inadmissible. *State v. Jackson*,

308 N.C. 549, 574, 304 S.E.2d 134, 148 (1983), *overruled on other grounds as stated in State v. Abbott*, 320 N.C. 475, 481, 358 S.E.2d 365, 369 (1987).("The use of trickery by police officers in dealing with defendants is not illegal as a matter of law. The general rule in the United States, which this Court adopts, is that while deceptive methods or false statements by police officers are not commendable practices, standing alone they do not render a confession of guilt admissible. The admissibility of the confession must be decided by viewing the totality of the circumstances . . . ." (internal citations omitted)); *State v. Chambers*, 92 N.C. App. 230, 233, 374 S.E.2d 158, 160 (1988) (holding that a police officer did not unlawfully obtain a statement from a defendant by asking him whether he would find "ass prints" on the hood of a vehicle in a rape case). Further, "the state of mind of the police is irrelevant to the question of the intelligence and voluntariness of respondent's election to abandon his rights." *Moran v. Burbine*, 475 U.S. 412, 423 (1986). While "police deception *might* rise to a level of a due process violation," it did not do so in a case in which the police deliberately did not allow a defendant to speak with his attorney absent the defendant's request for an attorney. *Id.* at 415, 432, 433–34.

Other state courts have also allowed officers to use trickery to obtain DNA evidence in connection with the service of valid arrest warrants for unrelated crimes. *See Com. v. Ewing*, 854 N.E.2d 993, 1001 (Mass. App. Ct. 2006), *aff'd*, 873 N.E.2d 1150 (Mass. 2007) (holding that "[t]he defendant had no expectation of privacy in cigarette butts" and a drinking straw that the defendant "voluntarily abandoned as trash" while being interviewed at the police station house after law enforcement served an arrest warrant for an unrelated crime); *see also State v. Athan*, 158 P.3d 27, 31–33 (Wash. 2007) (upholding a ruse by police against a challenge lodged under the Washington Constitution where a defendant was sent a letter from a fictitious law firm and his saliva was collected from an envelope on the return letter).

**v. Abandoned Property**

"The protection of the Fourth Amendment does not extend to abandoned property." *State v. Cromartie*, 55 N.C. App. 221, 225, 284 S.E.2d 728, 730 (1981); *see also* Robert L. Farb, *Arrest, Search, and Investigation in North Carolina* 175 (4th ed. 2011) ("The Fourth Amendment does not apply to searching or seizing abandoned property. The reason is fairly clear. A person cannot assert a violation of a legitimate expectation of privacy

if he or she has intentionally relinquished an interest in the property."). There is not a reasonable expectation of privacy when a person "voluntarily puts property under the control of another . . . [and] he must be viewed as having relinquished any prior legitimate expectation of privacy with regard to that property, as it becomes subject to public exposure upon the whim of the other person." *State v. Jordan*, 40 N.C. App. 412, 415, 252 S.E.2d 857, 859 (1979). If a party abandons property, "[t]here can be nothing unlawful in the Government's appropriation of such abandoned property." *Abel v. United States*, 362 U.S. 217, 241 (1960); *see also Phillips*, 132 N.C. App. at 771, 513 S.E.2d at 572 (upholding a trial court's decision to deny a motion to suppress because "defendant lost any expectation of privacy he might have had" in property by giving the property directly to a friend).

However, property may not be abandoned if it is done as a direct result of a law enforcement officer's illegal search or seizure. *See California v. Hodari D*, 499 U.S. 621, 627–29 (1991) (holding that abandoned cocaine was not the "product of an unlawful seizure" and was thus not excluded); *Hester v. United States*, 265 U.S. 57, 58 (1924) (upholding officers' examination of illegal whiskey bottles dropped by defendant and

a companion); *State v. Cooke*, 54 N.C. App. 33, 44, 282 S.E.2d 800, 808 (1981), *modified as aff'd*, 306 N.C. 132, 291 S.E.2d 618 (1982) (holding that when one discards property as the product of an illegal search, a reasonable expectation of privacy exists and the property is not abandoned); *State v. Williams*, 71 N.C. App. 136, 138, 321 S.E.2d 561, 563 (1984) (holding that a dropped jacket in a public place was abandoned); *Cromartie*, 55 N.C. App. at 223-24, 284 S.E.2d at 730 (holding there was abandonment when the defendant discarded the property into a public street and abandoned the property).

This Court has also held that "for abandonment to occur, the discarding of property must occur in a public place; one simply cannot abandon property within the curtilage of one's own home." *Reed*, 182 N.C. App. at 114, 641 S.E.2d at 323; *see also People v. Gallego*, 117 Cal. Rptr. 3d 907, 911 (Cal. Ct. App. 2010) (holding that a defendant does not have a reasonable expectation of privacy in a cigarette butt that was discarded on a public sidewalk). In *Reed*, police arrived at the defendant's apartment seeking a DNA sample, where they met the defendant on his patio. *Reed*, 182 N.C. App. at 110, 641 S.E.2d at 321. The defendant did not agree to provide a DNA sample, and spoke with police while he smoked two cigarettes on his patio. *Id.* The

defendant took apart the first cigarette butt, removed the filter's wrapper and "shred[ed] the filter before placing the remains in his pocket." *Id.* The defendant flicked the second cigarette butt at a trash pile in the corner of his patio. *Id.* The butt "struck the pile of trash and rolled between defendant and one of the detectives," the detective kicked the butt into a "grassy common area," and the detective thereafter collected the cigarette. *Id.* The State thereafter presented evidence showing that the DNA on the cigarette butt matched a stain found on the alleged victim's shirt. *Id.* This Court held that the defendant had a reasonable expectation of privacy on his patio and that the trial erred by allowing the evidence to be admitted at trial. *Id.* at 110–11, 641 S.E.2d at 321.

## vi. Application

This is a close case that lies squarely at the intersection of the foregoing principles of law. Officer Brienza's search was conducted as part of serving an unrelated arrest warrant. The arrest was effectuated despite Defendant's refusal on *four separate occasions* to provide officers with a DNA sample. The arrest was effectuated at his residence at 2:00 A.M. by a police officer who was explicitly asked by another officer to collect a DNA sample from Defendant. Defendant also relinquished the

cigarette butt directly to a police officer, rather than throwing the cigarette butt to the ground within the curtilage or placing it in a trash receptacle in the home or its curtilage.

We address first Defendant's argument that he did not relinquish control of the cigarette butt willingly. The record tends to show that Defendant was cuffed in front of his body and that Officer Brienza escorted him from his bedroom to the carport. Officer Brienza gave Defendant the option to smoke a cigarette in the carport area, which Defendant chose to do. Officer Brienza then lit the cigarette for Defendant. Officer Brienza then asked Defendant "[w]ould you like me to take that cigarette from you and *throw it away*." Defendant agreed to let Officer Brienza take the cigarette, which Officer Brienza removed from Defendant's mouth and placed into an evidence bag. Officer Brienza said he would not have allowed Defendant to take the cigarette into his vehicle.

Based upon the foregoing facts, the trial court concluded that Defendant relinquished control of the cigarette willingly. Officer Brienza asked Defendant first if he wanted to smoke a cigarette, to which Defendant responded affirmatively. Officer Brienza then asked Defendant if he could take the cigarette to

*throw it away*, and Defendant agreed. Officer Brienza then took the cigarette from Defendant's mouth and placed it in the evidence bag.

Defendant was handcuffed in the front of his body and took several puffs of his cigarette, although it is unclear whether he used his hands to smoke the cigarette. If Defendant had the ability to move his hands, he had the ability to throw the cigarette away himself and could have told Officer Brienza that he did not wish to give him the cigarette. If Defendant did not have the ability to move his hands, he then would have had the ability to spit the cigarette from his mouth into the curtilage. If Officer Brienza had collected the cigarette under any of those scenarios, admission would be barred under *Reed* and *Rhodes*. *Reed*, 182 N.C. App. at 110-11, 641 S.E.2d at 321; *Rhodes*, 151 N.C. App. at 215, 565 S.E.2d at 271. In short, there is evidence tending to indicate that Defendant voluntarily accepted Officer Brienza's offer to throw away the cigarette butt and accordingly Defendant's first argument fails.

Defendant next argues that the attendant circumstances surrounding this case give rise to a reasonable expectation of privacy that requires suppression of the cigarette butt as evidence. The controlling inquiry is whether Defendant had a

reasonable expectation of privacy in the cigarette butt that he voluntarily provided to Officer Brienza. Based upon controlling case law, we are bound to hold that he did not.

The location where Officer Brienza seized the cigarette butt was clearly within the curtilage of the residence: Defendant was standing in between the carport and the officer's police vehicle. The trial court properly held as much in its order denying the motion to suppress. Under *Reed*, *Rhodes*, and *Hauser*, Defendant could have spit the cigarette butt onto the ground in the carport, placed the cigarette into a trash can that was not intended to be collected, or left the cigarette butt somewhere else in the curtilage and the cigarette butt would have been subject to suppression. *Hauser*, 342 N.C. at 386, 464 S.E.2d at 446; *Reed*, 182 N.C. App. at 110–11, 641 S.E.2d at 321; *Rhodes*, 151 N.C. App. at 215, 565 S.E.2d at 271. However, the cigarette was not placed within a trash can, on the ground, or in any other container; the cigarette butt was placed in the gloved palm of Officer Brienza. As such, the trial court found that Defendant "relinquished possession of the butt and any reasonable expectation of privacy with regard to it" and that the location where Defendant relinquished control was "of no consequence." We agree with the trial court's assessment.

As in *Phillips* and *Jordan*, Defendant relinquished control of property, here a cigarette butt, to another party. *Phillips*, 132 N.C. App. at 771, 513 S.E.2d at 572; *Jordan*, 40 N.C. App. at 415, 252 S.E.2d at 857. In *Phillips*, the defendant threw drugs into a friend's lap after seeing police and while both were inside the defendant's car. 132 N.C. App. at 767, 513 S.E.2d at 570. The defendant told the friend to bring the drugs to defendant's apartment. *Id.* The defendant's friend left drugs in the defendant's mailbox, which was affixed to the front door of his apartment. *Id.* at 767, 769-70, 513 S.E.2d at 569-70. The defendant's friend told officers where the drugs were hidden, and officers seized the drugs from the mailbox. *Id.* at 766, 513 S.E.2d at 570. The defendant argued that he had a reasonable expectation of privacy in the mailbox, but this Court held that the defendant's actions in throwing the drugs into his friend's lap removed "any expectation of privacy he might have had in his property." *Id.* at 771, 513 S.E.2d at 572. Similarly, this Court held in *Jordan* that a defendant who put drugs into his female passenger's purse had relinquished his expectation of privacy in that item by placing the property under the control of another. 40 N.C. App. at 415, 252 S.E.2d at 859. In both *Phillips* and *Jordan*, property was relinquished

to another person inside a vehicle, an area which also creates a higher expectation of privacy than a public area. *See Phillips*, 132 N.C. App. at 771, 513 S.E.2d at 572; *Jordan*, 40 N.C. App. at 415, 252 S.E.2d at 857. In both cases, this Court upheld admission of the evidence.

Here, Defendant gave a cigarette butt to a police officer while in handcuffs and while in the officer's custody. Certainly a reasonable person's expectation of privacy would be diminished while in custody and handcuffed. *See, e.g.*, *Williamson v. State*, 993 A.2d 626, 635-36, 635-36 n.1 (Md. 2010), *aff'd as stated in Corbin v. State*, 52 A.3d 946, 952 (2012) (holding that the defendant did not have an expectation of privacy in a cup he "voluntarily discarded" on the floor of his jail cell, because he "could not reasonably expect that the police would not collect, and potentially investigate, the trash he discarded in his cell"), *cert. denied*, ___ U.S. ___, 131 S. Ct. 419 (2010). Accordingly, as the trial court found, the fact that Defendant placed the cigarette butt in Officer Brienza's control inside of the curtilage of his home is of no consequence to the analysis because Defendant ceded control of the property to Officer Brienza voluntarily after Officer Brienza's request. Thus, Defendant's second argument on appeal fails.

Defendant lastly argues that Agent Kaiser and Officer Brienza's use of trickery to obtain the cigarette butt requires that the evidence be suppressed. We note initially that we are troubled by the actions of Agent Kaiser and Officer Brienza in serving the earlier warrant upon Defendant. The use of one warrant for the intended purpose of conducting a search not supported by probable cause may, under other circumstances, violate the prohibition against general warrants in the North Carolina Constitution. *See* N.C. Const. art. I, § 20. Secondly, the officers' actions in this case also very nearly run afoul of the general prohibition that the State may not take actions having the effect of violating an individual's constitutional rights indirectly if they could not take that same action directly. *See, e.g.*, *Griffin*, 154 N.C. 611, 70 S.E. 292, 293 (1911). However, because the police did not commit an *illegal* act in effectuating the valid arrest warrant and because the subjective motives of police do not affect the validity of serving the underlying arrest warrant, we cannot agree with Defendant's final challenge to the trial court's decision. Defendant also did not argue that the police had used the initial arrest warrant as a general warrant. There may be circumstances in which an appellate court prohibits law

enforcement officers from using an arrest warrant to effectuate the ends sought to be achieved by a general warrant; however, without such an argument, it is not this Court's duty to decide a doctrine of this constitutional scope affecting the jurisdiction of the State.

When an individual "discards property as the product of some illegal police activity, he will not be held to have voluntarily abandoned the property or to have necessarily lost his reasonable expectation of privacy with respect to it." *Cromartie*, 55 N.C. App. at 225, 284 S.E.2d at 731. However, as stated *supra*, the underlying motivations for stopping a motorist or effectuating an arrest are not relevant so long as the underlying arrest was valid. *See, e.g.*, *State v. Parker*, 183 N.C. App. 1, 8, 644 S.E.2d 235, 241 (2007) ("A law enforcement officer's subjective motivation for stopping a motorist is irrelevant to the validity of a traffic stop if the stop is supported by probable cause.").

Standing alone, deception does not render a defendant's confession or relinquishment of evidence inadmissible. *See Jackson*, 308 N.C. at 574, 304 S.E.2d at 148 ("[W]hile deceptive methods or false statements by police officers are not commendable practices, standing alone they do not render a

confession of guilt inadmissible . . . ."); *State v. Graham*, ___ N.C. App. ___, ___, 733 S.E.2d 100, 105 (2012), *review denied*, 366 N.C. 432, 736 S.E.2d 492 (2013)("[D]eception is not dispositive where a confession is otherwise voluntary.").

There is no indication that Defendant's arrest for the two-year-old charge of assault on a female was invalid. While it is apparent that Officer Brienza and Agent Kaiser strategized to use this arrest warrant for the purposes of obtaining a DNA sample from Defendant, "the state of mind of the police is irrelevant to the question of the intelligence and voluntariness of respondent's election to abandon his rights." *Moran*, 475 U.S. at 423; *see also Ewing*, 854 N.E.2d at 1000 (upholding arrest of a defendant on an unrelated warrant, which police used to obtain a DNA sample). While we agree with Defendant that abandonment of property resulting from *illegal* police conduct is not abandonment, there was no such illegal activity here. *Cf. State v. Joe*, ___ N.C. App. ___, ___, 730 S.E.2d 779, 783 (2012) (holding that because officers only discovered a bag of cocaine near where Defendant was unlawfully arrested and handcuffed, the contraband was the product of an illegal arrest and was properly suppressed). Without illegal activity by the police, the abandoned property was properly seized, even though police did

not have probable cause to obtain it in the absence of abandonment. *See State v. Johnson*, 98 N.C. App. 290, 297, 390 S.E.2d 707, 711 (1990). Thus, Defendant's third principal argument for suppression fails.

Because Defendant voluntarily gave Officer Brienza his cigarette butt after Officer Brienza offered to throw away the cigarette butt, Defendant abandoned the cigarette butt and no longer had a reasonable expectation of privacy in the property. As the property was abandoned, the officers' subjective intent in effectuating the valid assault on a female warrant was irrelevant. For the foregoing reasons, we affirm the trial court's denial of Defendant's motion to suppress the DNA evidence. We now turn to Defendant's arguments concerning his motion for change of venue and the admission of expert testimony at trial.

**B. Change of Venue**

Defendant next argues that the trial court abused its discretion by denying his motion to change venue. We disagree.

If a trial court determines that there is "so great a prejudice against the defendant that he cannot obtain a fair and impartial trial," the trial court must transfer the proceeding to another county in the prosecutorial district or order a

special venire. N.C. Gen. Stat. § 15A-957 (2013). "To obtain a change of venue, a defendant must show a specific and identifiable prejudice against him as a result of pretrial publicity." *State v. Rogers*, 355 N.C. 420, 429, 562 S.E.2d 859, 866 (2002). In meeting this burden, "a defendant must show *inter alia* that jurors with prior knowledge decided the case, that defendant exhausted his peremptory challenges, and that a juror objectionable to defendant sat on the jury." *State v. Robinson*, 355 N.C. 320, 327, 561 S.E.2d 245, 250–51 (2002) (quotation marks, citation, and alterations omitted). Further, "[t]he determination of whether a defendant has carried his burden of showing that pre-trial publicity precluded him from receiving a fair trial rests within the trial court's sound discretion." *State v. Yelverton*, 334 N.C. 532, 540, 434 S.E.2d 183, 187 (1993).

Juror *voir dire* may present "persuasive evidence that the pretrial publicity was not prejudicial or inflammatory" through the jurors' responses to questioning about their knowledge of the case. *State v. Richardson*, 308 N.C. 470, 480, 302 S.E.2d 799, 805 (1983). In *Richardson*, nearly every juror "admitted to having read about the case in the newspaper or having heard about it on television." *Id.* When the jurors were questioned

further about the details of the particular incident, several of the jurors apologized for not remembering details and all of the jurors "unequivocally answered in the affirmative when asked if they could set aside what they had previously heard about defendant's case and determine defendant's guilt or innocence based solely on the evidence introduced at trial." *Id.* Accordingly, our Supreme Court held that the trial court did not abuse its discretion in *Richardson*. *Id.* at 481, 302 S.E.2d at 805; *see also State v. Walters*, 357 N.C. 68, 78, 588 S.E.2d 344, 351 (2003) ("[E]ach juror about whom defendant complains indicated that he or she would be fair and impartial and decide the case on the evidence that was presented. Also, the jurors indicated that they would disregard any information they heard or read prior to the trial."); *State v. Wallace*, 351 N.C. 481, 513, 528 S.E.2d 326, 346 (2000).

Ultimately, "[i]f each juror states unequivocally that he can set aside what he has heard previously about a defendant's guilt and arrive at a determination based solely on the evidence presented at trial, the trial court does not err in refusing to grant a change of venue." *State v. Moore*, 335 N.C. 567, 586, 440 S.E.2d 797, 808 (1994).

Here, potential jurors were questioned at length about their knowledge of Defendant's case and the pretrial publicity concerning Defendant's case. When prospective jurors indicated that they had knowledge of the case and formed an opinion about the case that they could not set aside, they were removed from the jury.

Five of the twelve jurors ("Jurors A–E") indicated that they had not seen, heard, or read any information about the case before jury selection. One juror ("Juror F") did not have any knowledge of the case prior to jury selection, but saw Defendant's photograph on the front page of a newspaper at Walgreens in between the first and second day of the jury selection process. Juror F did not read any information contained in the article and said she would follow the judge's instructions concerning the presumption of Defendant's innocence.

Another juror ("Juror G") said, during *voir dire*, that he seemed to have "heard something about it years and years ago," that his memory was vague, that he had not read or heard any information recently, and that he had not formed an opinion about the case. One juror ("Juror H") said she read headlines in the local paper around a week and a half before jury

selection and that she didn't remember anything about the case except that "it was an up and coming something."  Juror H also said she understood that the newspaper was not evidence, that the newspaper did not cause her to form an opinion, and that she had no presumptions about Defendant's guilt or innocence in the case.

Two jurors ("Juror I" and "Juror J") were familiar with media accounts of the case.  Juror I said she had read a paragraph in a newspaper article in which she learned that the case was a "cold case" reopened because of DNA, that the underlying incident concerned occurred in 2003, and that the incident was in Cleveland County.  Juror I swore that she knew the newspaper story was not evidence, that she should disregard that information, and that she had not formed an opinion.  Juror J said he saw a television story two nights prior to jury selection.  Juror J said "[a]bout all I heard was that they was [sic] looking for jurors for the case," that he was using his computer while watching it and that he did not know any other facts prior to jury selection.  Juror J also said "[a] man's innocent until he's proven guilty" and that he would have no problem returning a not guilty verdict if the State could not prove its case.  Juror J also said he saw a news report that "a

man had raped this older woman and killed her" and that the woman's name was Tessneer.

"Juror K" had read a "small article on Yahoo" about the case and said he had not formed any opinions about Defendant's guilt or innocence. Juror K said the article reported that "jury selection was about to begin," and that it caught his eye because he had been summoned for jury duty. Juror K said the article described the charges and that "[i]t did, though, talk about that there were two other cases out there that, I'm not sure who but somebody, they said related."

"Juror L" had read in the Shelby Star newspaper that Defendant was accused of "breaking in and killing a woman in Cherryville, and there were two other murders that were considered to be similar, although he has not been accused of those." Juror L also said she remembered that the victims lived close together. Juror L said she had not formed an opinion about the guilt or innocence of the defendant, but did read that there was "some information about DNA evidence" and that she was "a believer in DNA." Juror L said she would have no hesitation about returning a not guilty verdict if the State did not meet its burden of proof. Juror L said she had discussions with friends at work about the case. Juror L said the conversation

was that the court would be looking for jurors, but the group did not discuss the facts of the case. One gentleman who was Juror L's supervisor said "he went to church with the daughter of one of the victims" but was unsure which person he was referring to. Juror L said there were three crimes and that one was linked to this case, but that she did not know that Defendant had any relation to any of the victims in the case, including Ms. Tessneer. Juror L also said that she would presume Defendant to be innocent, put aside the article she read, listen to the evidence, and begin with a "clean slate."

Neither of the alternate jurors had read or heard anything about the case prior to jury selection. The foregoing tends to show that all jurors either indicated that they had no prior knowledge or that if they had read any information, they could put it aside at trial.

Defendant argues that his case resembles *State v. Jerrett*, 309 N.C. 239, 307 S.E.2d 339 (1983). However, this case is distinguishable from *Jerrett*. In *Jerrett*, ten of the twelve jurors, as well as both alternate jurors, "had heard about the case." *Id.* at 257, 307 S.E.2d at 349. Four jurors knew the defendant's family or relatives. *Id.* The jury's foreman said he had personally heard one of the victim's family members

"emotionally discussing the case." *Id.* Six of the jurors knew or were familiar with the State's witnesses. *Id.* The jury was examined collectively, rather than individually. *Id.* at 257–58, 307 S.E.2d at 349. The crime occurred in Alleghany County, which had a population of 9,587 at that time. *Id.* at 252 n.1, 307 S.E.2d at 346 n.1.

Here, six of the jurors had no knowledge of the case prior to the jury selection process. Neither of the alternate jurors had knowledge of the case prior to jury selection. The jury was selected using individual *voir dire*. None of the jurors selected knew any of the State's witnesses. The population of Cleveland County was 97,489 according to Defendant, a population 87,902 larger than the population of Allegheny County considered in *Jerrett*. Accordingly, we do not believe the situation presented here is similar to *Jerrett* and hold that Defendant did not meet his burden of showing that the trial court improperly denied his motion for a change of venue.

## C. Expert Testimony

Defendant next argues that the expert opinion testimony of Dr. Tracy and Dr. Butts was unreliable and should not have been admitted at trial under the rules of evidence. We disagree.

North Carolina Rule of Evidence 702(a) controls the

admission of expert opinion testimony:

> If scientific, technical or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion.

N.C. Gen. Stat. § 8C-1, Rule 702 (2009).[4] The admissibility of the expert testimony in the present case is evaluated under the three-step inquiry, outlined by our Supreme Court in *Howerton v. Arai Helmet, Ltd.*, 358 N.C. 440, 458, 597 S.E.2d 674, 686 (2004): "(1) Is the expert's proffered method of proof sufficiently reliable as an area for expert testimony? (2) Is the witness testifying at trial qualified as an expert in that area of testimony? (3) Is the expert's testimony relevant?" *Id.* (citations omitted).

As far as the first portion of the *Howerton* inquiry is concerned, reliability is a "preliminary, foundational inquiry into the basic methodological adequacy of an area of expert

---

[4] Rule 702 was amended by the General Assembly in 2011, but that change does not apply to Defendant's case since he was indicted on 11 January 2010. *See* 2011 Sess. Laws 1048, 1049, ch. 283, § 1.3 (stating that the amendment applies to defendants indicted after 1 October 2011). The federal standard announced in *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993) now applies in North Carolina under this Court's ruling in *State v. McGrad*y, ___ N.C. App. ___, ___, 753 S.E.2d 361, 367 (2014), *review allowed*, ___ N.C. ___, 758 S.E.2d 864 (2014).

testimony." *Id.* at 460–61, 597 S.E.2d at 687–88. The expert's opinion does not have to be *conclusively* proven or *conclusively* reliable to be admitted into evidence. *Id.* Any questions that remain about the "quality of the expert's conclusions" go to the weight that the trier of fact may give the testimony, rather than the testimony's admissibility. *Id.* Further, "the trial court should look to precedent for guidance in determining whether the theoretical or technical methodology underlying an expert's opinion is reliable." *Id.* at 459, 597 S.E.2d at 687.

*State v. Annadale*, 329 N.C. 557, 406 S.E.2d 837 (1991) provides an example in which our Supreme Court allowed an expert in forensic pathology to opine about the victim's cause of death when no physical evidence existed to show the cause of death. *Id.* at 573, 406 S.E.2d at 842. In *Annadale*, the forensic pathologist listed the cause of death as an "incision of the throat," which the pathologist admitted was based on information provided by law enforcement officers. *Id.* at 573, 406 S.E.2d at 847. In *Annadale*, our Supreme Court also noted that the forensic pathologist was the Chief Medical Examiner, was accepted as an expert in forensic pathology, and was well-qualified to provide an opinion that was helpful to the jurors. *Id.* The forensic pathologist was also subjected to cross-

examination by the defendant's counsel. *Id.* Our Supreme Court held under these circumstances, the trial court did not err in allowing the forensic pathologist to provide his opinion concerning the cause of the victim's death, even without physical evidence showing the cause of death. *Id.*

We face a similar situation in this case. Here, the forensic pathologists examined the body and eliminated other causes of death while drawing upon their experience, education, knowledge, skill, and training. Both doctors knew from the criminal investigation into her death that Ms. Tessneer's home was broken into, that she had been badly bruised, that she had abrasions on her arm and vagina, that her panties were torn, and that DNA obtained from a vaginal swab containing sperm matched Defendant's DNA samples. The doctors' physical examination did not show a cause of death, but both doctors drew upon their experience performing such autopsies in stating that suffocation victims often do not show physical signs of asphyxiation. The doctors also eliminated all other causes of death before arriving at asphyxiation, which Defendant contends is not a scientifically established technique. However, the reliability criterion at issue here is nothing more than a preliminary inquiry into the adequacy of the expert's testimony. *Howerton*,

358 N.C. at 460-61, 597 S.E.2d at 687-88.  Accordingly, the doctors' testimony met the first prong of *Howerton* so that "any lingering questions or controversy concerning the *quality* of the expert's conclusions go to the weight of the testimony rather than its admissibility."  *Id.* at 461, 597 S.E.2d at 688 (emphasis added).

Concerning the second portion of the *Howerton* inquiry, "the trial court must determine whether the witness is qualified as an expert in the subject area about which that individual intends to testify."  *Howerton*, 358 N.C. at 461, 597 S.E.2d at 688.  "Whether a witness has the requisite skill to qualify as an expert in a given area is *chiefly a question of fact*, the determination of which is ordinarily *within the exclusive province of the trial court*."  *State v. Goodwin*, 320 N.C. 147, 150, 357 S.E.2d 639, 641 (1987) (emphasis added).  "[A] jury may be enlightened by the opinion of an experienced cellar-digger, or factory worker, or shoe merchant, or a person experienced in any other line of human activity.  Such a person, when performing such a function, is as truly an 'expert' as is a learned specialist . . . ."  2 Kenneth S. Broun, *Brandis & Broun on North Carolina Evidence* § 184 at 701-02 (7th ed. 2011) (footnotes omitted).

Here, the trial court accepted both Dr. Tracy and Dr. Butts as experts in forensic pathology. Defendant did not object to Dr. Butts being qualified as an expert in the field of forensic pathology, but did unsuccessfully object to Dr. Tracy being qualified as an expert in forensic pathology. Dr. Butts had performed around 6,700 to 6,800 forensic autopsies. Both Dr. Butts and Dr. Tracy were cross-examined by Defendant. The trial court conducted *voir dire* prior to allowing their testimony. Under these facts, it is clear that the trial court did not abuse its discretion.

The third component in the *Howerton* test is whether the testimony is relevant. Relevant evidence is defined as "having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." N.C. Gen. Stat. § 8C-1, Rule 401 (2013). "Evidence is relevant if it has any logical tendency, however slight, to prove a fact in issue in the case." *State v. Tadeja*, 191 N.C. App. 439, 444, 664 S.E.2d 402, 407 (2008) (quotation marks, citation, and alterations omitted).

Defendant argues that "[t]his evidence was extremely prejudicial," although Defendant also argues that "[t]he cause

of death was important," noting that a different result might have been reached had the jury not heard the doctors' opinions as to the cause of death. Defendant essentially argues that the evidence *was important and relevant*, but makes an additional argument that the evidence was prejudicial. We find Defendant's argument concerning relevancy without merit. Accordingly, we hold that the trial court did not abuse its discretion in allowing the expert testimony of Dr. Tracy and Dr. Butts.

## IV. Conclusion

For the reasons stated above, we find no error in the trial court's judgments.

NO ERROR.

Judges ERVIN and DAVIS concur.